UNITED STATES of America

v.

David P. BAIRD, Appellant.

UNITED STATES of America

v.

David P. BAIRD, Appellant.

UNITED STATES of America

v.

David P. BAIRD, Appellant.

Nos. 90–3110, 92–3101 and 93–3016.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 21, 1994.

Decided July 15, 1994.

A.J. Kramer, Federal Public Defender, Washington, DC, argued the cause and filed the briefs, for appellant.

Robert T. Swanson, Asst. U.S. Atty., Washington, DC, argued the cause, for appellee. With him on the briefs, were Eric J. Holder, Jr., U.S. Atty., and John R. Fisher and Roy W. McLeese, III, Asst. U.S. Attys., Washington, DC.

Before: SILBERMAN, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

A jury convicted David P. Baird of violating one of the federal conflict of interest statutes, 18 U.S.C. § 203. Baird challenges the judgment of conviction, questioning whether the statute covered someone like himself working on relatively short-term assignments in the Coast Guard, arguing that the crime required a showing of specific intent, and attacking the trial court's exclusion of evidence bearing on his state of mind. We reverse on the third issue.

\* \* \*

Baird served as a full-time, active duty serviceman in the Coast Guard from 1975 until 1980, when he resigned his commission and joined the Reserves. In 1983, on being laid off from his job in the private sector, he returned to full-time military service as a Reserve officer under a series of consecutive temporary orders, assigned to either "Special Active Duty for Training" ("SADT") or "Temporary Active Duty" ("TEMAC") status. Because of downsizing in the Coast Guard, he was unable to get a permanent appointment. Two tours of this temporary duty are relevant to this proceeding: the first began on March 7, 1985, for which he received orders to serve on "effective duty for training" on a civil engineering project for a period of 139 days (ending July 23); the second began on July 24, 1985, on a different "special" project, for a TEMAC period not to exceed 69 days.

During the first of these tours of duty, Baird received a tip about a position as project manager for a firm known as International Science and Technology Institute ("ISTI"). The position involved lending technical expertise to ISTI's venture in seeking—

and then carrying out—a contract with the Coast Guard to design a system for controlling vessel traffic. Baird went to Washington, D.C. from his home in New Orleans for an interview with ISTI and to attend a meeting with the Coast Guard on behalf of ISTI, scheduled for July 3, 1985. ISTI reimbursed him for his expenses. The evidence reveals no meaningful participation by Baird at the meeting, which ended abruptly when the ISTI representatives became aware that the Coast Guard expected ISTI to present its proposal. Baird later spent time preparing for and attending a formal presentation on August 9, 1985, and received $800 for his time (16 hours at $50 an hour), plus expenses. In the August meeting Baird was introduced as a Reservist and the project manager for ISTI, and explained technical aspects of ISTI's proposal to representatives of the Coast Guard, the Small Business Administration and the Department of Transportation.

The government investigated Baird's participation in this meeting and secured first one and then a superseding indictment. It charged, in one count, a violation of 18 U.S.C. § 203, which prohibits various government personnel from lobbying for compensation. The jury returned a guilty verdict. The district court denied Baird's motion for judgment of acquittal, 778 F.Supp. 534 (D.D.C. 1990), and on June 1, 1990 sentenced him to a year in prison (suspended—the offense was pre-Guidelines), placed him on probation with a condition that he perform 200 hours of community service, and, as 18 U.S.C. § 203 requires, barred him from any future federal employment. Baird filed a timely notice of appeal from the judgment. Seven months later, he filed a motion for a new trial based on newly discovered evidence, which was denied by the district court on November 12, 1991. 778 F.Supp. 540 (D.D.C.1991).

\* \* \*

■ First, a jurisdictional issue: Although Baird did not file a timely notice of appeal from the denial of his motion for a new trial,

this failure does not bar our review of errors that had been properly preserved independently of that motion. Under the version of Rule 4(b) of the Federal Rules of Appellate Procedure in place during 1990–91, a post-judgment motion did not nullify a notice of appeal filed prior to its resolution unless the motion was of a type specified in the rule as extending the time limit for filing the notice, and in some circuits not even then. See Fed.R.App.P. 4(b), Notes of Advisory Committee on 1993 Amendment, subdivision (b).[1] As Baird filed his motion for a new trial on the basis of newly discovered evidence long after the 10–day period specified in Rule 4(b), the motion neither extended the deadline for his notice of appeal nor nullified his prior notice.

■ *Statutory coverage.* Baird argues that he was neither an "officer or employee of the United States" nor a special government employee, subject to the statute invoked against him. We agree that he was not a special employee but conclude that he was a regular officer.

At the time of Baird's association with ISTI, § 203(a) imposed criminal penalties on anyone who:

> otherwise than as provided by law for the proper discharge of official duties, directly or indirectly receives or agrees to receive, or asks, demands, solicits, or seeks, any compensation for any services rendered or to be rendered either by himself or another—
>
> . . . .
>
> (2) at a time when he is an officer or employee of the United States in the executive, legislative, or judicial branch of the Government . . .
>
> in relation to any proceeding . . . in which the United States is a party or has a direct and substantial interest, before any department, agency . . . or any civil, military or naval commission.

18 U.S.C. § 203(a) (1982). In addition, § 203(c) subjects "special government em-

---

1. In 1993, Rule 4 was amended to make clear that an otherwise timely filed notice of appeal filed prior to the disposition even of a *tolling* motion would automatically become effective upon disposition of the motion without the need to refile. See Fed.R.App.P. 4(b), Notes of Advisory Committee on 1993 Amendment, subdivision (b).

ployees" to the same sanctions, but under more limited circumstances.[2] Section 202 defines a special government employee as including, as its core instance:

> an officer or employee of the executive or legislative branch of the United States Government ... who is retained, designated, appointed or employed to perform, with or without compensation, for not to exceed one hundred and thirty days during any period of three hundred and sixty-five consecutive days, temporary duties either on a full-time or intermittent basis....

18 U.S.C. § 202(a) (1982).

The superseding indictment invoked both principles of coverage, charging Baird with being "an officer or employee of the United States ... and [ ] a special government employee". At trial, the government focused its proof on whether Baird was a special employee, and the jury instructions centered around the controlling definition of special employees in § 202. Baird argues that he did not fulfill the conditions for being a special government employee because he served *more* than 130 days in the 365-day period preceding his alleged violation and does not fit, he says, into any of the other kinds of employees classified in § 202 as special without regard to the number of days worked. The government now essentially concedes that Baird was not a special government employee, but contends that he was a regular officer or employee.

We agree with Baird that he cannot be considered a special government employee. The core definition, located in the first (quoted) sentence of § 202, encompasses those employees retained to perform "temporary duties" "not to exceed one hundred thirty days during any period of three hundred and sixty-five consecutive days". Baird's two tours of duty clearly aggregate more than 130 days (at least 139 for the first and 69 for the next). Indeed, by the time of the August meeting, he had been employed by the Coast

Guard for at least 156 days (139 days plus 17 days into the second tour). Thus, he fell outside the primary instance of special government employees.

Section 202 also identifies three types of workers as special government employees without regard to the 130-day cap. We agree with Baird that he belongs to none of them. He is clearly not a "person serving as a part time local representative of a Member of Congress in the Member's home district or State". Nor was he at the time of the August meeting a "Reserve officer ... while on active duty solely for training"; he was then on a TEMAC special project, not "solely" for training. Finally, he was not a "Reserve officer ... who is serving involuntarily"; he was serving entirely of his own volition.

■ That Baird is not a special employee does not get him off the hook. Section 202 contains another clause specially directed to certain Reserve officers not qualifying as special employees:

> A Reserve officer ... voluntarily serving a period of extended active duty in excess of one hundred and thirty days shall be classified as an officer of the United States within the meaning of section 203....

The government reads this as bringing within the category of regular "officer of the United States" any Reserve officer who serves in excess of the 130-day cap and does not fall within the exception clauses for service that is either involuntary or solely for training.

Baird answers that his second tour of duty—the one he was serving at the time of the August meeting—was only 69 days, so that he was not "serving *a period* of extended active duty in excess of one hundred and thirty days". Thus, he says, he cannot be covered.

There are a number of arguments supporting Baird's idea that his tours cannot be

---

**2.** A special government employee could be prosecuted for conflicts "only in relation to a particular matter involving a specific party or parties (1) in which he has at any time participated personally and substantially as a Government employee ... or (2) which is pending in the department or agency of the Government in which he is serv-

ing". 18 U.S.C. § 203(c) (1982). The government charged Baird with violating subsection (c)(2), but by doing so merely imposed on itself special burdens that are inapplicable if, as we find, he was properly classified as a regular employee.

aggregated under § 202's provision on Reserve officers serving voluntarily. First, Congress chose slightly different words to describe the 130 days relating to regular employee status of Reserve officers than it used for the 130–day cap in the core definition of special employees. Instead of merely inverting the core provision, which spoke of persons "retained ... to perform ... for not to exceed one hundred and thirty days", the qualification speaks in terms of a *"period of extended active duty in excess of"* 130 days. Each of Baird's two tours here involved a different project, and some of his temporary tours over the years involved different locations. Tr. III at 10 (project in Texas); *id.* at 11 (project in Morgan City, Louisiana); *id.* (project in New Orleans). At least in the early stages of the first tour he had no basis to expect that another would be added on. See Tr. II at 33 (testimony of Lieutenant Commander O'Dell) ("There was a maximum for the set of orders ... with the possibility of an extension, but no promises"); Tr. I at 190–92 (testimony of Captain Snook) (TE-MAC status is not on "active duty" as that term of art is understood to mean eligible for promotion lists and indefinite terms of service).

■ Further, Congress created the category of special employee, and imposed less stringent standards on such persons, "in the interest of facilitating the Government's recruitment of persons with specialized knowledge and skills for service on a part-time basis". S.Rep. No. 2213, 87th Cong., 2d Sess., 4 (1962), *reprinted in* 1962 U.S.C.C.A.N. 3852, 3853. That beneficent purpose might be thwarted if persons knew that their entry on a less–than–130–day tour of duty might be aggregated with a second tour, transforming them into regular employees and subjecting them—perhaps retroactively—to the broader standards.

In the end, however, these arguments do not add up. It is not very surprising that Congress did not simply invert its basic 130–day formula when it came to these officers. It was, after all, addressing a narrow subset of officers, namely Reserve officers, in the context of a variety of provisions allowing such officers special-employee status even

where their service exceeded the usual 130–day cap. Second, if Congress intended the sentence only as a reminder that Reserve officers on active duty are "officer[s] ... of the United States" under § 203 *unless* they fell within one of the special employee categories, a perfectly natural reading of § 203, it would have felt no need to use a precise inversion of the cap language. Further, as "tour of duty" is a well known phrase applicable to Reserve officers, Congress's use of the much vaguer "period" tends to refute the idea that it intended no aggregation of tours of duty.

Nor does the uncertainty of persons in a tour of duty less than 130 days, but who may have enough tacked on to reach that limit (in any 365 days), seem such a great problem. During that period the employee can either (1) comply with the standards applicable to regular employees, or (2) resolve not to allow his or her aggregate time to exceed the 130–day limit.

■ Finally, Baird's interpretation yields bizarre results. Reserve officers on duty in excess of the cap but only for training, or serving in excess of the cap involuntarily, would be subject to the restrictions for special employees, but an officer with back-to-back tours of voluntary, non-training duty stretching on indefinitely would be subject to no part of § 203. In these circumstances, we do not think the statute reaches that degree of ambiguity required for application of the rule of lenity. *Staples v. United States,* —— U.S. ——, —— n. 17, 114 S.Ct. 1793, 1804 n. 17, 128 L.Ed.2d 608 (1994) (rule of lenity "reserved for cases where after seizing every thing from which aid can be derived, the Court is left with an ambiguous statute") (citations and internal quotations omitted); *Chapman v. United States,* 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (rule of lenity inapplicable unless "there is a grievous ambiguity or uncertainty in the language and structure of the Act"). Accordingly, we find a Reserve officer serving on active duty in excess of the cap to be a regular officer unless he falls within one of the exceptions in § 202 rendering him a special employee (i.e.,

he is serving involuntarily or solely for training).[3]

One problem still remains, but it is theoretical only. The instructions to the jury on the elements of the offense were framed so that they could convict if they found Baird a special employee, and did not raise the alternative of regular employee status.[4] But Baird raised no objection on this ground. Thus, if there were no other ground for reversing for a new trial, we would have to consider the usual plain error issues. Since we do reverse on other grounds, however, the issue is moot.

■■■ *Scienter.* The superseding indictment charged Baird with *"knowingly,* directly and indirectly receiv[ing] and agree[ing] to receive compensation, otherwise than as provided for by law" (emphasis added). The instructions to the petit jury, on the other hand, directed that "[t]his offense requires only a general intent, and this means that if you find the defendant knowingly committed the act that the law here involved makes a crime, you may infer his intent to commit the offense...." Baird argues that knowledge that he was a covered employee is an element of 18 U.S.C. § 203 and that the government failed to prove that he possessed the requisite knowledge.

Baird relies on *United States v. Nofziger,* 878 F.2d 442 (D.C.Cir.1989), to support his view that the statute requires that he knew that his position was a covered one. This misconceives *Nofziger.* There we held that "the government was required to prove that [the defendant] had knowledge of all the *facts* making his conduct criminal" under the provision involved, *id.* at 443 (emphasis added), which there included the possibly obscure fact that the agency contacted by the defendant had "a direct and substantial interest" in the subject that the defendant raised. See 18 U.S.C. § 207(c). We did not find that the statute required knowledge that those

facts added up to a crime. Thus *Nofziger,* to the extent applicable at all, requires only that the government prove that Baird knew the facts that made the conduct criminal, e.g., that he was a Reserve officer, that he was on active duty as such an officer (for a certain number of days, to be held as a regular officer), etc. The charge to the jury required it to find that Baird had such knowledge.

Apart from *Nofziger,* Baird claims that the statutory expression at the outset of § 203(a) "otherwise than as provided by law for the proper discharge of official duties" imposes a burden on the government to prove Baird knew his conduct violated some law. But the Fifth Circuit has held that both § 203(a), and 18 U.S.C. § 201(g), also containing the "otherwise than as provided by law" phrase, have no such intent requirement. "The gravamen of each offense, then, is not an intent to be corrupted or influenced, but simply the acceptance of an unauthorized compensation." *United States v. Evans,* 572 F.2d 455, 481 (5th Cir.1978) (citing cases). The court read the phrase "otherwise as provided by law" merely to require a showing that the defendant received money "to which he is not lawfully entitled". *Id.* at 480. In reaching this conclusion it relied in part on our own decision in *United States v. Brewster,* 506 F.2d 62, 72–74 & n. 26 (D.C.Cir.1974), finding that 18 U.S.C. § 201(g) did not require specific intent. See also *United States v. Standefer,* 610 F.2d 1076, 1079 (3d Cir.1979) (en banc) (all that jury need find under § 201(g) was that the defendant received the money because of his official position), aff'd on other grounds, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980). We find this construction persuasive, especially as § 203(a) lacks any other term of culpability such as the "knowingly" in § 203(b) (proscribing payment, as opposed to receipt, of compensation to federal employees for services rendered),

---

**3.** Because we find Baird to be a regular employee, we need not address his argument that the government's proof was inadequate to show that the matter was "pending" before the Coast Guard, as required by § 203(c).

**4.** The instructions read: "The essential elements of this offense, as described in the indictment,

each of which the government must prove beyond a reasonable doubt, are as follows: ... (2) that these services were rendered or to be rendered at a time when the defendant was a special government employee of the United States Coast Guard".

or the "corruptly" in 18 U.S.C. § 201(b) (proscribing bribery).

■ Baird presents a fallback position—that unless the statute is limited to persons who know they are covered, it is unconstitutionally vague. The question is whether the statute gives "fair notice of the offending conduct". *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972). Baird was working full time for the United States at the relevant time, even though for one of successive limited terms. The arguments for his *not* being covered require rather subtle legal analysis. We think the statute provided the necessary notice.

It remains to decide, however, whether the government's inclusion of the word "knowingly" in the indictment binds it to prove knowledge of the criminal nature of the acts. In *United States v. Pumphrey,* 831 F.2d 307 (D.C.Cir.1987), we found that although the government had alleged an overt act in an indictment for conspiracy under 21 U.S.C. § 846, the statute did not require the overt act and the government was not bound to prove it at trial. *Id.* at 309. We said that "excess allegations in an indictment that do not change the basic nature of the offense charged need not be proven and should be treated as mere surplusage". *Id.* (citing *United States v. Miller,* 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985)). We can find no other case that has articulated a "basic nature of the crime" test for identifying surplusage that may be jettisoned. Compare *United States v. Greene,* 497 F.2d 1068, 1086 (7th Cir.1974), which held that the government need not prove specific intent at trial for general intent air piracy even though it had inserted "knowingly" and "willingly" into the indictment. We take it that the purpose of the test is to protect a defendant who may have completely misdirected his trial strategy as a result of the extra language. The parties have not argued whether it had any such diversionary effect in the trial now completed; it surely will have none in any future retrial.

■ *Excluded testimony.* At trial the government presented evidence that before his first trip to Washington, Baird had consulted with Captain Thomas Snook, the District Legal Officer and designated Deputy Ethics Officer, and was told he could lawfully accept travel expenses for an interview, but could not participate in presentations or "vouch" for ISTI. Tr. I at 179–83. In addition, Jonathan Armenta testified that in an interview after the event Baird admitted he knew he had done something wrong. Tr. II at 7, 13. Baird attempted to offset this with testimony from Lieutenant Commander Eugene O'Dell about advice O'Dell had received from Coast Guard legal and contracting officers and relayed to Baird. The government objected on grounds that the legal and contracting officers' statements were hearsay, and the court sustained the objection.

Baird's attorney, however, made the limited purpose of the proffered testimony perfectly clear: "The government started out this case accusing Mr. Baird of not just violation of the statute, but of knowing it was wrong, of intentionally misleading people as to his status.... And in response to that, I introduced evidence concerning what David, advice David had been given to rebut that". Thus Baird offered O'Dell's statements of his conversation with Baird only to show Baird's state of mind, not for the truth of the matter asserted. Accordingly, the testimony was not hearsay. See Fed.R.Evid. 801.

■ In denying the defendant's post-trial motion for acquittal, the trial court added another ground of exclusion—that the testimony was irrelevant because the crime contained no scienter element and because Snook, not O'Dell, was the proper legal official for Baird to consult. We review for abuse of discretion. *BWX Electronics, Inc. v. Control Data Corp.,* 929 F.2d 707, 714 (D.C.Cir.1991); *Exum v. General Electric Co.,* 819 F.2d 1158, 1162 (D.C.Cir.1987); *United States v. Morgan,* 581 F.2d 933, 936 (D.C.Cir.1978).

■ Despite the absence of any burden on the government to show knowledge, we think the evidence was clearly relevant and admissible. First, the government "opened the door" on the matter of defendant's state of mind. With Snook's and Armenta's testimony it sought to show that Baird deliberately disregarded the direct advice of his

legal officer, evidence which (if believed) would be quite prejudicial. Once the door is opened, the other party can get through it otherwise irrelevant evidence "to the extent necessary to remove any unfair prejudice which might otherwise have ensued". *United States v. Brown*, 921 F.2d 1304, 1307 (D.C.Cir.1990) (citing Cleary, *McCormick on Evidence* § 57 (3d ed. 1984)). The excluded O'Dell testimony—solely about what he relayed to Baird—is of exactly that sort. The government often successfully argues for the right to introduce evidence in response to irrelevant or inadmissible testimony going to the issue of intent. See, e.g., *United States v. Manganellis*, 864 F.2d 528, 536–37 (7th Cir.1988) (citing cases); *United States v. Vaglica*, 720 F.2d 388, 393 (5th Cir.1983). The door opens both ways.

On any retrial, of course, the government may refrain from offering the testimony of Snook and Armenta. Baird argues that without the door-opening the testimony would be relevant to his defense of "official misstatement of the law". Citing *United States v. Barker*, 546 F.2d 940 (D.C.Cir.1976), Baird claims he was entitled to introduce evidence of reliance upon the word of a superior officer who had verified the legality of Baird's action with Coast Guard legal and contracting officers. The government responds that it was objectively unreasonable for Baird to rely on legal advice relayed by O'Dell, a third party who was not an official entrusted with administration of conflict of interests laws, or indeed in any way qualified to give a legal opinion.

The court in *Barker* reversed the convictions of two Watergate footsoldiers in a per curiam opinion. Judge Merhige, relying heavily on § 2.04(3)(b) of the Model Penal Code, said in his separate opinion that the defense of official misstatement of the law was available to a defendant who:

> (1) reasonably, on the basis of an objective standard, (2) relies on a (3) conclusion or statement of law (4) issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field.

*Id.* at 955. In *Barker* the defendant's immediate source, E. Howard Hunt, possessed no administrative authority, but Judge Merhige believed that the jury could have found that Hunt passed on the opinion of John Erhlichman that the break-in of Dr. Lewis Fielding's office was legal, "which [opinion] they, acting as reasonable men, relied upon in performing the break-in." *Id.* at 957.

The exact precedential effect of Judge Merhige's opinion is unclear, since he voted to reverse even though the evidence in *Barker* did not seem to measure up to his standard. As we said in *United States v. North*, 910 F.2d 843, modified on other grounds, 920 F.2d 940 (D.C.Cir.1990):

> North cannot even approach the showing that Judge Merhige's formulation of the defense requires. North does not even claim that he relied on *any* "conclusion or statement of *law*," let alone one "issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field." On the other hand, neither did Barker or Martinez, yet Judge Merhige voted that their convictions had to be reversed.

910 F.2d at 880 (citations omitted). While concluding that Colonel North had clearly not made out the defense articulated by Judge Merhige, we expressed doubt as to the precedential value of the case, because of the tension between the action of the court (under the facts) and the rule stated. See *id.* at 881. Yet we expressly said that we did "not mean to suggest that criminal defendants in this Circuit could not avail themselves of the defense of reliance on an official misstatement of law as that defense is described in Judge Merhige's opinion." *Id.* at 881 n. 10.[5]

The government apparently does not challenge the authority of the legal and contracting officers with whom O'Dell consulted. Thus, while the indirect character of the legal advice allegedly received by Baird would clearly go to the reasonableness of any reliance on it, especially in light of the direct communication of Snook, it appears to fit within the defense as formulated by Judge Merhige.

---

**5.** We note that the other judge voting for reversal of the convictions did so on a somewhat broader theory. But see *King v. Palmer,* 950 F.2d 771, 782–85 (D.C.Cir.1991) (en banc) (finding no controlling legal holding where "one opinion supporting the judgment does not fit entirely within a broader circle drawn by others").

Finally, we reject the government's argument that the proffered testimony was cumulative with testimony O'Dell was permitted to give about his conversations with Baird. The government relies on the following exchange between Baird's counsel and O'Dell:

> [O'Dell]: I told David that I would check with our legal and our contracting officer to see if there would be any conflict of interest as far as a reserve officer is concerned. I had told him also that I know there was a conflict of interest as far as a regular Coast Guard officer was concerned. I also told him I did not think that there was any conflict of interest because he was not a permanent employee.
>
> [Counsel]: After you checked with your legal officer and contracting officer, you again—did you again have conversations with David?
>
> [O'Dell]: I did.
>
> [Counsel]: All right, and did you pass that information on to David?
>
> [O'Dell]: I did.
>
> [Counsel] And did you yourself say anything about your opinion as to the conflict of interest?
>
> [O'Dell]: ... [A] lot of discussion was made in this area.... It was my feeling that if there was any doubt, even after checking with the legal officer and the contracting officer, that [disclosure that Baird was in the Reserves] would remove all doubt, and David being a good soldier, had done his homework.

Tr. II at 41–47. It seems plain that whatever this may have conveyed about *O'Dell*'s views, it did not transmit any of the legal and contracting officers'. Thus Baird was substantially prejudiced by their exclusion.

*Miscellaneous.* Baird raises an assortment of other trial errors. Some are moot (e.g., those relating to the instructions defining special government employees), some barred by Baird's failure to file a timely appeal from denial of his motion for a new trial on grounds of newly discovered evidence, and others relate to minor trial episodes that do not appear particularly likely to recur on retrial.

\*     \*     \*

Because of the erroneous exclusion of O'Dell's testimony about what he told Baird of the opinions of legal and contracting officers, the conviction is

*Reversed.*