UNITED STATES of America,
Plaintiff–Appellee,

v.

Massoud NOUSHFAR; Zohreh Shayesteh and Kamran Shayesteh, Defendants–Appellants.

Nos. 94–30229, 94–30350 and 94–30353.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 8, 1996.

Decided March 20, 1996.

Arlen R. Sturm; Helen J. Brunner, Assistant United States Attorneys, Seattle, Washington, for plaintiff-appellee.

Michael Filipovic, Assistant Federal Public Defender, Seattle, Washington, for defendant-appellant Massoud Noushfar.

Ted W. Cassman, Cooper, Arguedas & Cassman, Emeryville, California, for defendant-appellant Zohreh Shayesteh.

Elliot R. Peters; Steven A. Hirsch, Keker & Van Nest, San Francisco, California, for defendant-appellant Kamran Shayesteh.

Before: BROWNING, WRIGHT and CANBY, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

This case involves a conspiracy to smuggle valuable Persian rugs into the United States in violation of an Executive Order. Because the jury was allowed during deliberations to listen to audiotapes never played in open court, we reverse the convictions and remand for a new trial.

## FACTS

Kamran Shayesteh and his wife Zohreh own and manage the Galleria deFarsh, a large rug store in Burlingame, California. In 1987, a presidential order imposed an embargo on virtually all Iranian goods. *See* Exec. Order No. 12613 (Oct. 29, 1987), 31 C.F.R. §§ 560.201, 560.403. The embargo prevented importation of Iranian products, but did not prevent ownership. The restriction created a sudden increase in demand and in price for the limited supply of Persian (Iranian) rugs already in the United States.

According to the government, the Shayestehs conspired with Massoud Noushfar and Manuchehr Rabie to smuggle Persian rugs from Canada, where they could be legally imported, to California. The conspiracy worked more or less as follows: The Shayestehs, with the assistance of Rabie, imported Iranian rugs from Tehran to Vancouver, often via Singapore, Hong Kong or Malaysia. The rugs were then smuggled into the United States by drivers who failed to declare the rugs or else lied about their origin.

During three smuggling operations, the defendants were assisted by Tim Meyer, an undercover United States Customs agent, whom the Shayestehs hired to drive a truck over the border filled with contraband rugs. When the rugs entered Washington state, customs officials documented them and marked them with an invisible thread. The rugs were delivered to Noushfar in Seattle, and he sent them to the Galleria in California.

With this information, the government obtained a seven-count indictment. The central charge against all defendants was conspiracy to smuggle Iranian-origin rugs into the United States. The six other charges related to the conspiracy. The Shayestehs were each charged with three counts of money-laundering and with criminal forfeiture; both Kamran and Noushfar were charged with making false statements to Customs. Rabie was originally charged with conspiracy but pleaded guilty and testified against his co-conspirators in exchange for a lenient sentencing recommendation. At trial, the Shayestehs argued that they were entrapped. Noushfar denied knowledge of the conspiracy and was acquitted of making false statements. The defendants were found guilty of all other charges.

## ANALYSIS

### I. Audiotapes

During the undercover investigation, customs agents recorded many potentially incriminating conversations with the defendants. Over vigorous objections, the district court allowed the jury to take to the jury room fourteen tapes that had not been played in the courtroom. The jurors requested and were provided with a tape recorder. They were given no instructions about the tapes.

■ It is clear that the court erred in sending the tapes to the jury room. On three occasions, we have considered problems associated with having a jury *rehear* tapes that have already been played in open court. *See United States v. Felix–Rodriguez*, 22 F.3d 964 (9th Cir.1994); *United States v. Brown*, 832 F.2d 128 (9th Cir.1987); *United States v. Kupau*, 781 F.2d 740, 741–43 (9th Cir.), *cert. denied*, 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 45 (1986). These cases establish that, at a minimum, replaying the tapes is error because the period when the jurors listen to tapes is "properly viewed as a stage of the trial at which the presence of the defendant is required." *Kupau*, 781 F.2d at 743; *see* Fed.R.Crim.P. 43(a).[1] The question

---

1. Fed.R.Crim.P. 43(a) provides:

The defendant shall be present at the arraignment, at the time of the plea, at every stage of

in this case is whether the error can be reviewed for harmlessness, as it was in the replay cases, *Felix–Rodriguez*, 22 F.3d at 967 (harmless error); *Brown*, 832 F.2d at 130 (harmful error); *Kupau*, 781 F.2d at 743 (not plain error), or whether it was a structural error requiring reversal.

Allowing the jury to listen, without any guidance, to tapes that had never been presented in open court is a more grievous error than replaying them in a judge's presence. These tapes went to the jury room in violation of Rule 43 and, possibly, the Confrontation Clause. The court completely abdicated control of the presentation of the evidence. It made no analysis of whether undue emphasis might be placed on some of the recorded conversations. The court gave no instruction that the jurors must listen to the tapes in their entirety in accordance with the rule of completeness and Fed.R.Evid. 106. And this error undermines one of the most fundamental tenets of our justice system: that a defendant's conviction may be based only on the evidence presented during the trial. Sending the tapes to the jury room is akin to allowing a new witness to testify privately, without cross-examination, to the jury during its deliberations.

In cases where the error is so fundamental and defies meaningful review, we have said that harmless or plain error analysis may not be applied. Instead, we find the error to be a structural error requiring automatic reversal. We find structural error where there are "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Arizona v. Fulminante*, 499 U.S. 279, 309,

111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991).[2] Sending unplayed tapes to the jury room is such a defect. It violates the basic framework of the trial system, which requires that evidence be presented and tested in front of the jury, judge and defendant.

Two recent cases provide guidance. In *Guam v. Marquez*, 963 F.2d 1311, 1315 (9th Cir.1992), we found structural error where the court gave written instructions to the jury in lieu of reading them in open court. We concluded that the error "compels an automatic reversal because the impact of the error on the jury's performance of its duties cannot be reviewed." *Id.* at 1316. Here, we cannot assess the impact of the unplayed tapes on the jury's deliberations. Based on the request for a tape recorder, we may assume that the jurors listened to at least part of one tape, but because of the time constraints they cannot have listened to all of them.

In *Riley v. Deeds*, 56 F.3d 1117, 1121 (9th Cir.1995), we found structural error when an audiotape was replayed in court without the judge present and with his clerk "presiding." We said that structural error analysis was the correct approach where there was a "complete abdication of judicial control over the process. In this structural vacuum, a rule requiring the defendant to show prejudice, or one requiring the state to show lack of prejudice, makes no sense." *Id.* Here, the district court also abdicated its control by sending the tapes to the jury room without first playing them in open court and without presiding during their presentation. In these circumstances we are unable to determine whether the jury's use of the tapes

---

the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.

2. Structural errors differ from "trial errors," which are reviewed for plain or harmless error. Trial errors are those mistakes that "occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 307–08, 111 S.Ct. at 1264. *Cf. United States v. Olano*, 62 F.3d 1180, 1187 (9th Cir.1995) (on remand) (applying plain error anal-

ysis when a juror missed a half-day's testimony and caught up by reading the transcript where the court knew what testimony the juror missed and could assess the harm); *Lee v. Marshall*, 42 F.3d 1296, 1298 (9th Cir.1994) (applying harmless error analysis after two police officers entered the jury room without permission to set up a video machine where officers could be placed under oath and asked about their interaction with the jury). We recently held that allowing a defendant to be sentenced to death outside his presence is not a structural error and described the error as "trivial." *Rice v. Wood*, 77 F.3d 1138, 1143 (9th Cir.1996) (en banc). The error here was far from "trivial."

violated the rule of completeness or whether the portions the jury heard provided undue emphasis. Fed.R.Evid. 106; *see United States v. Binder,* 769 F.2d 595, 600 (9th Cir.1985).

We reverse all convictions. We find it unnecessary to address most other issues raised by the defendants. We address two issues that might be raised in a new trial.

## II. Vindictive Prosecution

The Shayestehs argue that the three money-laundering charges in the superseding indictment should not only be reversed, but must also be dismissed for vindictive prosecution. The proper standard of review for vindictive prosecution is unsettled. *United States v. Montoya,* 45 F.3d 1286, 1291 (9th Cir.) ("The court has variously applied abuse of discretion, clearly erroneous, and *de novo* standards."), *cert. denied,* — U.S. —, 116 S.Ct. 67, 133 L.Ed.2d 29 (1995). We need not clarify the standard because even upon de novo review, the district court properly denied the motion.

A prosecutor violates due process when he brings additional charges solely to punish the defendant for exercising a constitutional or statutory right. *Bordenkircher v. Hayes,* 434 U.S. 357, 363, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978). To establish a claim of vindictiveness the defendant

> must make an initial showing that charges of increased severity were filed because the accused exercised a statutory, procedural, or constitutional right *in circumstances that give rise to an appearance of vindictiveness.*

*United States v. Gallegos–Curiel,* 681 F.2d 1164, 1168 (9th Cir.1982) (emphasis added). The prosecution then has the burden to show a non-vindictive reason for bringing the charges. *Id.*

The Shayestehs allege first that the government brought the additional charges to punish them for refusing to accept a plea bargain. During plea negotiations, however, prosecutors may threaten additional charges and may carry through on this threat. *United States v. North,* 746 F.2d 627, 632 (9th

Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 832 (1985). This action alone does not violate a defendant's due process rights, nor does it create a presumption of vindictiveness. *See United States v. Goodwin,* 457 U.S. 368, 380–81, 102 S.Ct. 2485, 2492, 73 L.Ed.2d 74 (1982). The further allegation that the charges were filed because the defendants had moved to suppress evidence is also insufficient to create a presumption of vindictiveness. *See id.* at 381, 102 S.Ct. at 2493 ("Defense counsel routinely file pretrial motions to suppress evidence.... It is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter.").

Even if there had been a presumption, the government has overcome it by explaining the timing of the charges filed, its discussions with defense counsel and its consultations with the Department of Justice regarding the propriety of money-laundering charges. We hold that there was no governmental misconduct and that the money-laundering charges need not be dismissed.

## III. Searches and Seizures

The Shayestehs contend that the district court should have suppressed evidence seized in several searches. We affirm the district court's admission of evidence seized in the search of the warehouse and Galleria. The search of the apartment, however, was unreasonable. On a new trial, the district court will consider whether any evidence was tainted by that search.

### A. *Warehouse and Galleria*

The Shayestehs argue that the search warrant for their store and warehouse was overbroad. The warrant allowed seizure of all 857 Iranian-origin rugs (worth several million dollars) in the warehouse and all documents relating to the "purchase, importation, and distribution of Iranian-origin carpets." The Shayestehs argue that the warrant should have been limited to seizure of the approximately 200 carpets,[3] and their accompanying documents, that had been marked to identify

---

**3.** Only 114 of these were found during the    search.

them as part of the undercover smuggling operations.

■ We review de novo a finding that a warrant was sufficiently specific. *United States v. Spilotro,* 800 F.2d 959, 963 (9th Cir.1986). Three factors determine whether a warrant is overbroad when it allows seizure of all of a class of items:

(1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.

*Id.* (internal citations omitted).

■ This warrant was appropriately limited according to the *Spilotro* requirements. First, there was probable cause to seize all the Iranian carpets.[4] The affidavit alleged a series of three smuggling transactions and referred to interviews, document review and other evidence. It described other non-undercover smuggling operations such as the trip by Rebecca Tehrani and an attempt by Kamran and Noushfar, where the smuggled rugs would not have been marked with special thread. The affidavit listed hundreds of carpets known to have been imported by Rabie or the Shayestehs into Vancouver where the Shayestehs had no store. Considering these facts and giving a common sense reading, we conclude that there was probable cause to seize all Iranian-origin rugs found in the warehouse.

Second, the warrant gave objective standards to distinguish the items to be seized and was limited specifically to carpets origi-

nating in Iran and accompanying documents. *Cf. United States v. Kow,* 58 F.3d 423, 425, 427–28 (9th Cir.1995) (finding overbreadth where warrant set no time limits and allowed seizure of "essentially all of the business's records, computer hardware and software, files, ledgers, and invoices"). The government had two experts in carpet identification present during the search to avoid a taking of non-Iranian products. *Cf. Center Art,* 875 F.2d at 749–50.

Third, it was not necessary for the government to be more specific in its description of the carpets. There was probable cause to seize all Iranian carpets. *See also United States v. Holzman,* 871 F.2d 1496, 1509 (9th Cir.1989) (upholding warrant for "any cash, jewelry, bonds and notes obtained through this fraud scheme.").

We conclude that the warrant was not overbroad.

### B. *The Shayestehs' Apartment*

The Shayestehs argue that upon their arrest customs agents undertook an impermissible sweep of their apartment. With information learned then the agents later secured a search warrant. The Shayestehs maintain that the items seized under the warrant were impermissible "fruits" and should have been suppressed.

■ Motions to suppress evidence are reviewed de novo. *United States v. Prieto–Villa,* 910 F.2d 601, 604 (9th Cir.1990). The underlying facts found by the court are reviewed for clear error. *Id.*

In *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 1094, 108 L.Ed.2d 276 (1990), the Supreme Court defined a protective sweep as "a quick and limited search of premises.... It is narrowly confined to a

---

**4.** The Shayestehs' reliance on *Center Art Galleries–Hawaii, Inc. v. United States,* 875 F.2d 747 (9th Cir.1989), is misplaced. There, the defendants were suspected of mail and wire fraud involving the sale of forged Salvador Dali paintings. Dali artwork made up approximately 20 percent of the defendant's collection, but pursuant to the search warrant, investigators were allowed to seize five truckloads of documents, artwork, and other property, including all "documents, books, ledgers, records and objects which are evidence of violations of federal criminal law," without any limitation to Dali-related sales. *Id.* at 749–50. We held that the officers were justified in seizing *all* Dali artwork (even though only 22 pieces were alleged to have been fraudulent), but required the government to return the non-Dali art and documents. *Center Art* would help the defendants only if the warrant had allowed seizure of non-Iranian rugs. The warrant, however, carefully limited the seizure to Iranian rugs, although non-Iranian rugs made up 80 percent of the inventory.

cursory visual inspection of those places in which a person might be hiding." The Court held that

> as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Id.* at 334, 110 S.Ct. at 1098. The "sweep" by the seven customs agents exceeded the limits of a *Buie* sweep in both time and scope.

 A protective sweep may last "no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36, 110 S.Ct. at 1099. Agents testified that they arrested the Shayestehs within a minute of entering the apartment. Instead of leaving promptly, they made the Shayestehs sit in their living room while the agents went through the apartment for more than a half-hour. During this period, they spotted a box with business receipts in a closet. Thereafter, other agents returned to the closet to examine the box further.[5] There was no suggestion that the agents feared for their safety. Even if the box had been in "plain view," the further examination exceeded the narrow purpose of a *Buie* sweep.

The agents seized nothing during this sweep, but may have used information therefrom to obtain the search warrant. If this issue is raised in a new trial, the district court should determine what, if any, later-seized documents were impermissible "fruits" of the sweep.

## CONCLUSION

We reverse the defendants' convictions on all counts based on the structural error. We find it unnecessary to reach most of the other issues raised by the defendants. Upon remand the chief district judge is requested to reassign the case.

REVERSED.

---

5. An agent then placed a long-distance telephone call (on the Shayestehs' bill) to the Customs' Office and a local call to the U.S. Attorney's office to discuss whether they should seize the box. They were advised not to do so.