UNITED STATES of America, Appellee,

v.

Harold CUNNINGHAM and Percy
Barron, Appellants.

Nos. 97–3017, 97–3044.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 7, 1998.

Decided June 19, 1998.

Rehearing Denied Aug. 26, 1998.

Stephen C. Leckar and Jonathan Zucker, appointed by the court, argued the causes and filed the joint briefs for appellants Harold Cunningham and Percy Barron.

Rachel Carlson Lieber, Assistant U.S. Attorney, argued the cause for appellee, with whom Wilma A. Lewis, U.S. Attorney, John R. Fisher, and Kenneth L. Wainstein, Assistant U.S. Attorneys, were on the brief. Elizabeth Trosman, Mary–Patrice Brown, and Thomas C. Black, Assistant U.S. Attorneys, entered appearances.

Before: EDWARDS, Chief Judge, SILBERMAN, Circuit Judge, and BUCKLEY, Senior Circuit Judge.

HARRY T. EDWARDS, Chief Judge:

Appellants raise numerous challenges to their convictions arising from a 68–count indictment against them. Only a few of the issues raised merit our attention here.

We reject Appellant Harold Cunningham's claim that the District Court erred in permitting him to represent himself at trial. The District Court's findings that Cunningham's decision to represent himself was knowing and voluntary met the criteria specified in *Faretta v. California,* 422 U.S. 806, 95 S.Ct.

2525, 45 L.Ed.2d 562 (1975), for determining when a defendant may exercise his constitutional right to forego his right to counsel. In particular, we reject Cunningham's assertion that he was faced with a "Hobson's choice" between representing himself or accepting inadequate counsel. The record indicates that the District Judge assured herself that Cunningham's attorney was adequately prepared for trial and made every reasonable effort to reassure Cunningham regarding his counsel's competence and preparedness in response to Cunningham's expressed concerns about his trial counsel. Where a defendant's complaints against counsel plainly lack merit, a court cannot allow itself to be manipulated into granting a continuance and appointing new counsel just to placate a defendant threatening to represent himself.

Appellant Percy Barron argues that the inadvertent submission of unadmitted evidence to the jury during its deliberations constitutes a violation of the Sixth Amendment, requiring a reversal of all the convictions against him. The Government responds that, although the alleged error was constitutional, there was overwhelming, untainted evidence sufficient to support Barron's convictions, so the error should be deemed harmless. Recent Supreme Court cases, as well as cases from this circuit, have clarified that harmless error review of constitutional errors calls for an inquiry as to whether the Government has shown beyond a reasonable doubt that the error at issue did not have an effect on the verdict, not merely whether, absent the error, a reasonable jury could nevertheless have reached a guilty verdict. Applying this standard, we find that the Government has failed to show beyond a reasonable doubt that the error at issue did not affect the jury's verdicts pertaining to the charges arising from the Sun Ray Market shootings. Accordingly, we reverse Barron's convictions arising from that incident. However, applying the same standard, we decline to reverse the convictions of Barron that were unrelated to the Sun Ray Market shootings.

In addition, we hold that several of Appellants' convictions should have been merged for sentencing purposes. Each Appellant's two convictions for armed robbery arising out of the Sammy's Liquor Store incident should merge into one, since Appellants robbed only the liquor store and not its employees. Also, each Appellant's armed robbery convictions should merge with their felony murder convictions where the indictment specified the armed robberies as the predicate for the felony murder counts. In addition, all eight of Cunningham's convictions under 18 U.S.C. § 922(g) should be merged into one, since the jury was never instructed that, to convict on each section 922(g) charge separately, it must find that the weapons were separately acquired or stored.

## I. BACKGROUND

### A. The Indictment

On April 13, 1995, Appellants Harold Cunningham and Percy Barron, together with codefendant Billy Richardson, were charged, pursuant to both federal and District of Columbia law in a 68–count indictment, with a series of armed robberies, assaults, and murders committed over a 139–day period in the summer of 1993. The indictment charged Appellants with Racketeer Influenced and Corrupt Organization ("RICO") counts for operating and conspiring to operate a criminal enterprise in violation of 18 U.S.C. § 1962(c) (counts 1–2) and with separate charges relating to several of the predicate racketeering acts (counts 3–68). The predicate acts arise from fifteen separate incidents alleged in the indictment: (1) the Sibley Plaza armed robbery; (2) the Discount Carpet armed robbery; (3) the IBEX Club assaults; (4) the Marvin Thomas assault; (5) the armed robbery of Officer Barnes; (6) the Annapolis armed robbery; (7) the Sammy's Liquor armed robbery; (8) the assault on Officer Hasenpusch; (9) the Horace and Dickie's armed robbery; (10) the attempted U–Haul armed robbery; (11) the Fair Liquor murders and robberies; (12) the Tyrone Holland murder; (13) the Sun Ray Market shootings; (14) the Marvin Thomas murder; and (15) the assault on Officer McDowell. The indictment charged Cunningham with various offenses arising from all fifteen of the alleged incidents; Barron was charged with

specific offenses arising from all the incidents except for the assault of Officer McDowell. In addition, Appellants were charged with various gun possession offenses.

### B. *Cunningham's Election to Represent Himself*

Robert Tucker, of the Federal Public Defender's office ("FPD"), represented Cunningham from the time of Appellant's arraignment until early April 1996. The record indicates that Cunningham became dissatisfied with Tucker's representation after reading a newspaper article about the offenses with which he was charged. Apparently, Cunningham interpreted this article as insinuating that Tucker believed Cunningham to be guilty of the charges alleged. *See* Tr. 4/26/96 at 7.

In an effort to placate Cunningham, the FPD replaced Tucker with Gregory Spencer. Prior to his appointment, Spencer had served as co-counsel to Tucker, first entering an appearance on March 6, 1996. At a status hearing on April 26, 1996, shortly before trial was then scheduled to begin, Cunningham expressed concern that Spencer would simply be picking up from where Tucker had left off, and stated that he did not want to be represented by anyone from FPD. *Id.* at 8. In response to questioning by the court, Spencer confirmed that he had fully examined Cunningham's file and conferred with Cunningham. He also stated that he felt he could make his own strategic decisions in the case, but that his ability to take an entirely new approach to the case would be "handicapped, to some degree" by the fact that most of the initial case preparation had been completed before he became involved in the case. *Id.* at 9–10.

The court denied Cunningham's request for a change of counsel, stating that it had "no reason to doubt the competen[ce], the zealousness, the seriousness or the belief of Mr. Spencer in the merits of his client's case." *Id.* at 12–13. The court also explained that the newspaper article about which Cunningham had complained could not be fairly read as an indication that Tucker believed Cunningham was guilty of the crimes alleged. Rather, the article had sim-

ply quoted Tucker's motion to dismiss the case which, in turn, had summarized the Government's allegations against Cunningham. *Id.* at 10–12. The court said the motion to dismiss was "vigorously written, ... extensively researched, and raised every argument that I can imagine could have been raised." *Id.* at 12.

At this point, Cunningham asserted that, if his request for new counsel were to be denied, he would rather represent himself. *Id.* at 13. The trial judge warned Cunningham that this was a risky decision, detailed for him some of the rigorous trial procedures he would be expected to follow, and admonished him to think carefully and consult with his family before making such a grave decision. *Id.* at 119–23. At a pretrial hearing a few days later, the trial judge conducted a more detailed explanation of the demands of the criminal trial process, inquired into Cunningham's understanding of such requirements, and repeatedly warned him against proceeding *pro se.* Tr. 4/30/96 at 45–60. Cunningham asserted that he understood "the seriousness of the case." *Id.* at 59. The trial judge briefly addressed the issue at a May 6, 1996 hearing, reiterating her faith in Spencer's ability to zealously represent Cunningham, based upon his performance in the case thus far and the time available for further preparation prior to trial. Tr. 5/6/96 at 26–27. Finally, on May 21, 1996, the court permitted Cunningham to represent himself, appointing Spencer as stand-by counsel, making the resources of the FPD available to Cunningham, and advising Cunningham that he could change his mind about representation at any time. Tr. 5/21/96 at 10–12, 65. On May 29, 1996, after Cunningham again reasserted his decision to represent himself, the court made specific findings on the record that, based upon her long discussions with Cunningham and his active participation thus far, Cunningham had made a knowing and intelligent waiver of his right to counsel. Tr. 5/29/96 at 38–39.

### C. *Trial and Verdicts*

Trial commenced on June 3, 1996 and concluded on July 30, 1996.

After several days of deliberations, the jury returned partial verdicts as to each defendant on August 9, 1996, and then resumed deliberations. On August 15, 1996, the jury returned verdicts on several of the remaining counts. The jury acquitted Cunningham on all charges relating to the armed robbery of Officer Barnes (counts 28–30) and the Horace & Dickie's armed robbery (counts 39–45). The jury acquitted Barron on all charges relating to the Sibley Plaza armed robbery (counts 3–5, 8). Although the jury found both Cunningham and Barron guilty of the assault and gun possession charges arising from the Sun Ray incident (counts 56–61), it could not reach a verdict on the count charging Appellants with first-degree murder of Anthony Johnson at the Sun Ray Market (count 55). In addition, the jury was unable to reach a verdict on the RICO charges (counts 1–2). The jury convicted Appellants of the remaining counts charged against them. The court declared a mistrial as to the Anthony Johnson murder and RICO charges and entered judgments of acquittal and conviction consistent with the jury's verdicts.

D. *The Inadvertent Submission to the Jury of Unredacted 911 Tapes*

Appellants were charged with murdering Anthony Johnson and assaulting Nefaertari McCree and Bernice Douglas during a shooting inside the Sun Ray Market on September 20, 1993 (counts 55–57). Various gun possession charges also arose from this incident (counts 58–61). Romeo Williams was called by the prosecution to offer eye-witness testimony incriminating Appellants for these charges. Williams testified that three young men ran from the Sun Ray Market following the shooting, that one was tall and light-skinned and another was shorter and dark-skinned (descriptions which accord with Cunningham and Barron, respectively), and that the shorter, dark-skinned man was wearing a black "hoodie" and black cut-off jean shorts and carrying a chrome gun. These descriptions match the clothing Barron was wearing at the time of his arrest hours after the Sun Ray incident and the chrome-plated Iberia pistol used in the shooting. Williams testified further that the two men described

drove off in a maroon Nisson Maxima, a description which matches the vehicle Appellants were driving when apprehended following the Sun Ray incident. He further testified that he pulled up to the side of the vehicle to look at the two men, followed them for some way, and recorded the car's license plate number, but that he broke off the chase and called 911 when he grew concerned that they may have realized that he was following them. *See* Tr. 6/26/96 p.m. at 40–43, 47–57.

Williams' credibility as a witness was seriously called into question by Appellants' efforts to impeach him. With Williams' testimony in doubt, the Government sought and was granted leave by the trial judge to play Williams' 911 call in open court in order to rehabilitate his testimony regarding the incident. Williams' 911 call was consistent with his testimony at trial. *See* Transcript of Unredacted Tape, attached to Memorandum of Law in Support of Defendant's Motion for a New Trial as Exhibit A, *reprinted in* Record Material for Appellee ("R.M.") at 65–66 ("Unredacted Tape, R.M. at . . ."). The portion of the 911 tapes containing Williams' call was admitted into evidence, and a redacted tape recording containing only that call was supposed to go to the jury.

The jury ultimately convicted Appellants of the assault and weapon possession charges arising from the Sun Ray incident, but was unable to reach a verdict on the Anthony Johnson murder. After the jury had rendered its verdicts and the court had declared a mistrial as to the remaining counts, the court permitted Government and defense counsel to meet with the jurors. During that meeting, several jurors mentioned that, during their deliberations, they had been provided with an unredacted 911 tape, which included the unadmitted 911 calls of eight other people as well as police radio transmissions related to the same event, in addition to Williams' 911 call.

Upon learning of the jurors' exposure to this extrinsic evidence, Barron moved for a new trial, pursuant to FED.R.CRIM.P. RULE 33, on the ground that his Sixth Amendment right to confront all witnesses against him had been violated in that the jurors effective-

ly heard the testimony of eight additional government witnesses whom he did not have the opportunity to confront or cross-examine at trial. Barron argued that this error was a "structural defect" automatically requiring a new trial. Alternatively, Barron argued that, even under the harmless error standard, the error required a new trial. He contended that the error could not be deemed harmless beyond a reasonable doubt given that the unredacted tape contained various eyewitness descriptions that corroborated Williams' otherwise suspect testimony, and that the prosecution had failed to provide any other witnesses offering eyewitness testimony implicating Barron in the Sun Ray shootings. Barron argued further that the statements on the unredacted tapes not only connected Barron to the Sun Ray charges but also, indirectly, to the remainder of the charges against Barron, based on the *modus operandi* argued by the prosecution and ballistic evidence gathered from the Sun Ray incident.

The Government conceded that the inadvertent submission of the unredacted tapes to the jury was constitutional error, but argued that this error was harmless and, therefore, did not warrant reversal of any of Barron's convictions. The District Court held that the error did not constitute a structural defect and was harmless and, accordingly, denied Barron's motion. *See* Memorandum Opinion and Order, *United States v. Barron*, Crim. No. 95–88–02 (D.D.C. Feb. 20, 1997) ("Mem. Op.").

## II. ANALYSIS

On appeal, Appellants challenge their convictions on numerous grounds. We have considered all of Appellants' claims and find most of them to lack merit. Only two of Appellants' challenges to their convictions warrant discussion here: Cunningham's claim that the District Court erred in permitting him to represent himself and Barron's claim that the inadvertent submission to the jury of the unredacted 911 tapes renders his convictions invalid. In addition, we address Appellants' claims that various of their convictions should have been merged for sentencing purposes.

### A. The District Court Did Not Err in Permitting Cunningham to Represent Himself

■ A criminal defendant has a constitutional right to represent himself at trial. *See Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). To be valid, the defendant's election to waive his right to counsel must be knowing, intelligent, and voluntary. *Id.* at 835, 95 S.Ct. 2525. To say that such an election must be "intelligent" does not mean that it must be perceived as reasonable or wise, for, in setting out this standard, the Court recognized that "it is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts." *Id.* at 834, 95 S.Ct. 2525.

■ To ensure that a choice for self-representation is knowing, intelligent, and voluntary, a court must apprise the defendant of the "dangers and disadvantages" entailed by such a decision "so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Id.* at 835, 95 S.Ct. 2525 (internal quotations and citation omitted). In *United States v. Brown*, 823 F.2d 591 (D.C.Cir.1987), this court gave shape to this requirement. In *Brown*, a case with complexity and numerosity of counts similar to Cunningham's, several of the defendants claimed on appeal that the trial court erred in allowing them to represent themselves. 823 F.2d at 599. This Court denied their claim, finding that the trial court had engaged in a full discussion with the defendants regarding the risks of self-representation.

The record discloses that the trial court engaged in a full discussion with the appellants regarding the dangers of self-representation. The judge informed the appellants of the seriousness of the charges against them, warned them that he could not assist them in their defense, told them that he would have to conduct the trial in accord with the Federal Rules of Evidence and Criminal Procedure, and stated that "it is a distinct handicap to be engaged in a serious criminal matter without any legal training or background and without the

active assistance of a trained lawyer." In addition, the judge asked the appellants many times whether they understood his comments and whether they had any questions.

*Id.* (internal citation omitted). In approving this "model" of discourse, the *Brown* court emphasized that "[n]either case law nor common sense" requires the court to address in detail every possible difficulty a defendant might encounter. *Id.*

The extensive colloquy between the District Court and Cunningham regarding his decision to represent himself clearly meets the standard set forth in *Brown.* This colloquy took place over the course of several days. On each occasion, Judge Kessler sternly warned Cunningham of the dangers and disadvantages of proceeding *pro se* and urged him to take more time to reconsider his decision. *See* Gov't Br. at 17–20 (quoting relevant portions of transcript).

 Cunningham argues on appeal that, given his IQ of 68, he was unable to make an informed, knowing, and voluntary decision to represent himself. Throughout the pretrial proceedings relating to Cunningham's self-representation, however, the trial judge made it clear that she found Cunningham to be a highly intelligent person. *See* Gov't Br. 19–20 n.27 and citations to transcript therein. Although a reviewing court decides *de novo* whether the record demonstrates a knowing, intelligent waiver of a defendant's right to counsel, "whether the defendant misunderstood what the court said, despite defendant's unambiguous answers indicating comprehension, is a pure question of fact which depends primarily on the demeanor, conduct, and intonations of the defendant" and, thus, is reviewed for clear error. *See Virgin Islands v. Charles,* 72 F.3d 401, 404 (3d Cir. 1995). Cunningham points to nothing in the record indicating that the trial court's findings regarding his intelligence were clearly erroneous.

 In addition, Cunningham argues that his decision to represent himself was not a voluntary decision because he was faced with a "Hobson's Choice" between accepting appointed counsel whom he felt was not pre-

pared for trial and representing himself. Where, as here, a *Faretta* election appears grounded in dissatisfaction with counsel, the trial court must evaluate the defendant's objections to ensure that the self-representation election is voluntary. It is clear that the trial court adequately did so here. Cunningham never offered any specific concerns about Spencer or the FPD other than the newspaper article which had caused him to doubt the loyalties of Tucker, his first FPD lawyer, and Spencer's "handicap" in utilizing groundwork which had already been completed by Tucker. Prior to accepting Cunningham's *Faretta* election, Judge Kessler explained that Cunningham's complaints about Tucker based on the newspaper article were not well-founded. *See* Tr. 4/26/96 10–12. More importantly, she found Spencer to be a competent and zealous advocate, based upon his performance during the early stages of the case as well as his responses to the court's inquiries, and repeatedly assured Cunningham of her confidence in Spencer. *See id.* at 10–13; Tr. 4/30/96 at 60 (judge did not "think for one minute that [Spencer] is just picking up a file"); Tr. 5/6/96 at 26 ("There is not a shred of evidence before this court that [Spencer] would be ineffective."). Where a defendant's complaints of his counsel's inadequacy plainly lack merit, a court cannot allow itself to be manipulated into granting a continuance and appointing new counsel just to placate a defendant threatening to represent himself. *Accord United States v. Salemo,* 61 F.3d 214, 221 (3d Cir. 1995).

B. *Inadvertent Submission to the Jury of the Unredacted 911 Tapes*

1. *Cunningham's Claims were not Preserved for Appeal*

 On appeal, Cunningham seeks to join Barron's appeal on the issue of the inadvertent submission of the unredacted 911 tapes, arguing that this error influenced the jury's verdicts against him as well as against Barron. As an initial matter, we find that Cunningham's claims pertaining to the 911 tapes are not properly before this court.

Cunningham asserts that the District Court's standing order deemed Cunningham

to have joined in Barron's motion for a new trial and that, by sentencing Cunningham before deciding that motion, the trial judge in effect denied the motion as to Cunningham. The standing order to which Cunningham refers, entitled "Standing Order Governing Procedures in Criminal Trial" provides that "any objection, motion or other application for relief made by any defense counsel orally or in writing shall be deemed to be adopted and joined in by every other defendant, respectively, without announcement by counsel to that effect, and the rulings of the Court shall be deemed applicable to each defendant unless otherwise stated at the time the ruling is made." *See* Cunningham's Supp. Br., App. at 4. It is not clear that this standing order was intended to apply to post-trial motions as well as objections raised during the course of trial. *Compare United States v. Gatling,* 96 F.3d 1511, 1521 (D.C.Cir.1996) (applying clear error standard of review for all defendants where at least one defendant objected during trial). The record provides no indication that Cunningham ever argued to the District Court that the 911 tapes also prejudiced him, and the District Court construed Barron's motion for a new trial as applying to Barron alone and did not make any findings or judgment regarding the effect of the error on Cunningham. *See* Mem. Op. at 1–6.

Moreover, although Cunningham appealed his convictions prior to the District Court's denial of Barron's motion for a new trial, he failed to file a separate notice of appeal after the post-trial motion foundered. Cunningham's reliance on *United States v. Baird,* 29 F.3d 647 (D.C.Cir.1994), in support of his contention that a separate notice of appeal was unnecessary, is misplaced. In *Baird,* this court simply clarified that the filing of a post-trial motion does not nullify a notice of appeal filed prior to its resolution nor bar review of errors that had been properly preserved independently of the posttrial motion. *Id.* at 649 & n. 1. Contrary to Cunningham's suggestion, *Baird* does not stand for the proposition that a timely-filed notice of appeal automatically includes appeal of a subsequently-denied post-trial motion. Indeed, the *Baird* court declined to hear the appellant's claims pertaining to the denial of his post-trial motion in light of his failure to

timely appeal from the denial of the motion, notwithstanding his earlier-filed notice of appeal. *See id.* at 655.

### 2. *Standard of Review*

 The inadvertent submission of the unredacted 911 tapes to the jury violated the Sixth Amendment Confrontation Clause, in that it effectively provided to the jury testimony of eight other witnesses without allowing the defendants to confront or cross-examine these witnesses at trial. *See Turner v. Louisiana,* 379 U.S. 466, 472–73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). Whether this constitutional error requires reversal of Barron's convictions is governed by the harmless error standard of review. *See Brown v. United States,* 411 U.S. 223, 230–32, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) (admission of out-of-court statement of a nontestifying co-defendant in violation of the Sixth Amendment Confrontation Clause subject to harmless error review). *See also United States v. Treadwell,* 760 F.2d 327, 339–42 (D.C.Cir. 1985) (applying harmless error review where appellant claimed she was entitled to a new trial because a document that had not been offered into evidence had been sent to the deliberating jury inadvertently).

Barron contends that the inadvertent submission to the jury of the unredacted tapes is a structural error requiring automatic reversal of his convictions, relying on *United States v. Noushfar,* 78 F.3d 1442 (9th Cir. 1996). We disagree. The type of error at issue here can "be quantitatively assessed in the context of the evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt," *Arizona v. Fulminante,* 499 U.S. 279, 307–08, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), and is not one which affects "[t]he entire conduct of the trial from beginning to end." *Id.* at 309, 111 S.Ct. 1246.

This holding is not inconsistent with those of the Ninth Circuit. In *Noushfar,* the Ninth Circuit construed the trial judge's provision to the deliberating jury of fourteen highly-incriminating taped conversations between defendants and undercover police officers which had never been played in court as a

"structural error" requiring automatic reversal of the defendants' convictions. *See* 78 F.3d at 1445. However, the Ninth Circuit later limited this holding in *Eslaminia v. White*, 136 F.3d 1234 (9th Cir.1998), a case more closely resembling the instant case. In *Eslaminia*, a tape recording of a police interview with the defendant was admitted into evidence and provided to the jury during its deliberations. *Id.* at 1236–37. Following the verdict, defense lawyers learned that the jury had also listened to the reverse side of the tape, which contained comments made by the defendant's brother, also recorded during an interview with a police officer. The brother's comments had not been admitted into evidence, and the brother did not testify at trial. *Id.* at 1237. The Ninth Circuit held that this error violated the Sixth Amendment Confrontation Clause. *Id.* The defendant, relying on *Noushfar*, argued that this was a structural error requiring automatic reversal. *Id.* at 1237 n. 1. The Ninth Circuit distinguished *Noushfar* and applied the harmless error standard, noting that "jury consideration of taped comments by [ ] non-testifying part[ies] raises discrete evidentiary issues that the court may clearly identify and analyze, and is similar to other commonly-recognized trial errors." *Id.* We agree with the Ninth Circuit's analysis in *Eslaminia*.

 Under the applicable harmless error standard, a constitutional error is harmless and does not require reversal only if the Government can show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Recent Supreme Court cases, as well as cases from this circuit, have clarified that harmless error review calls for an inquiry as to whether the Government has shown beyond a reasonable doubt that the error at issue did not have an effect on the verdict, not merely whether, absent the error, a reasonable jury could nevertheless have reached a guilty verdict. *See Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (harmless error inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered

in *this* trial was surely unattributable to the error"); *United States v. Smart*, 98 F.3d 1379, 1391 (D.C.Cir.1996) (distinguishing harmless error test from mere sufficiency-of-the-evidence test), *cert. denied*, — U.S. —, 117 S.Ct. 1271, 137 L.Ed.2d 349 (1997); *see also Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) ("The [harmless error] inquiry cannot be merely whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence."); *see generally* Harry T. Edwards, *To Err is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?*, 70 N.Y.U. L. Rev. 1167 (1995) (analyzing case law on harmless error review and distinguishing "effect on the verdict" inquiry from "guilt-based" inquiry). Where there is uncertainty as to the effect on the verdict, the error cannot be deemed harmless; rather, the court must treat the error as having affected the verdict. *See O'Neal v. McAninch*, 513 U.S. 432, 435–36, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995); *Smart*, 98 F.3d at 1391–92; *United States v. Pryce*, 938 F.2d 1343, 1349–50 (D.C.Cir.1991).

Resting appellate review of constitutional trial errors on a guilt-based inquiry into whether, even absent the error, a reasonable jury might have nevertheless reached a guilty verdict based upon the lawful evidence before it would be "inconsistent with the constitutional framework of our system" which "grants criminal defendants the right to have juries, not appellate courts, render judgments of guilt or innocence." Edwards, 70 N.Y.U. L.Rev. at 1192. As the Supreme Court explained in *Sullivan v. Louisiana*, "to hypothesize a guilty verdict that was never rendered—no matter how inescapable the findings to support that verdict might be— would violate the jury-trial guarantee." 508 U.S. at 279, 113 S.Ct. 2078. *See also Kotteakos*, 328 U.S. at 763–64, 66 S.Ct. 1239.

3. *Barron's Convictions Arising from the Sun Ray Market Incident*

Barron claims that allowing the jury to hear the unredacted tape was not harmless error because the extrinsic evidence on the

911 tapes corroborated and bolstered the testimony of Romeo Williams who, Barron points out, was an unreliable witness. Given the centrality of Williams' otherwise-suspect testimony to the Government's case against Barron for the Sun Ray charges, Barron contends, the Government cannot show beyond a reasonable doubt that the unredacted tape did not influence the jury's verdicts with regard to these charges. Barron notes that the unadmitted 911 calls and police radio transmissions regarding on-the-scene witness interviews conclusively established that, contrary to Barron's defense, two shooters ran from the Sun Ray Market shooting, and that one of them, a young man closely resembling Barron, had carried a gun similar to the chrome-plated Iberia pistol fired at Sun Ray. *See* Unredacted Tape, R.M. 57–73.

■ The Government offers three arguments in response. First, the Government contends that the error was harmless because the jurors may not have listened to the tape until after they had rendered their verdicts on the Sun Ray Market counts. In support of this contention, the Government offers an affidavit provided by an FBI Special Agent who had participated in the jury debriefing session at which the error initially was discovered. *See* Affidavit o' Special Agent Vincent Lisi, *reprinted in* Gov't Supp. Br., App. 2.

However, as the District Court noted, neither the statements of the jurors at the post-trial debriefing session nor that of Agent Lisi have been subject to cross-examination, and thus the court declined to rely on them in ruling on the motion. *See* Mem. Op. at 4 n.2. For the same reason, we also decline to base our ruling on the Lisi Affidavit. Instead, because the parties agree that the jurors were in possession of the unredacted tape since the commencement of their deliberations, we assume, absent any compelling evidence to the contrary, that they listened to it prior to rendering their verdicts on the Sun Ray charges.

■ Second, the Government argues that the error was harmless because Williams' testimony was sufficiently bolstered by Williams' own 911 call—the portion of the 911 tapes that was played in open court and

properly made available during jury deliberations. The Government claims Williams' testimony was also bolstered by his notation of the get-away vehicle's license number, and that the extrinsic evidence on the unredacted tape had very little, if any, bolstering effect on Williams' testimony. This argument tracks the District Court's determination that although, following defense counsel's efforts to impeach Williams, the jury may have had good reason to doubt Williams' general credibility, "his testimony on the narrow issue relevant to whether Mr. Barron participated in the Sun Ray Market incident was straightforward and credible." Mem. Op. at 4–5.

■ It is for the jury, not the court, to evaluate witness credibility. The prosecution and the District Court acknowledge that Williams' general credibility was doubtful, but endorse his testimony pertaining to the Sun Ray incident on the basis of its consistency with his properly-admitted 911 call. However, Williams' 911 call was only admitted because Williams' testimony was in dire need of rehabilitation. Given the vulnerability of Williams' testimony in the absence of the 911 tapes and the way in which the extrinsic evidence on the unredacted tapes bolstered Williams' testimony, we cannot find beyond a reasonable doubt that the extrinsic evidence did not influence the jury to accept Williams' testimony rather than reject it, and that its acceptance of Williams' testimony did not, in turn, affect its verdicts convicting Barron on the Sun Ray charges.

■ Finally, the Government argues that, even assuming that the jury would have rejected Williams' testimony absent the error, the error must nevertheless be deemed harmless in light of what it describes as overwhelming, untainted evidence implicating Barron for the Sun Ray charges. However, the Government is unable to highlight any eyewitness testimony implicating Barron for the Sun Ray shootings equivalent to that of Williams and unidentified callers on the 911 tapes. Rather, the Government highlights the following evidence implicating Barron for the Sun Ray charges: motive evidence regarding Appellants' ongoing "beef" with An-

thony Johnson and his organization, the Madness Connection; witness testimony that Barron, with gun in waistband, made a statement that afternoon that he and Cunningham had to "take care of something;" witness testimony that Cunningham called the next day and told witness that they had to "get" the Madness Connection; Barron's admission to a cellmate of involvement in the Sun Ray shooting; Barron's letter to a friend, written while incarcerated solely on Sun Ray charges, stating his concern that one of the government's star witnesses was cooperating with authorities and discussing ways to prevent her from doing so. *See* Gov't Supp. Br. at 6 n.5 and record citations therein. In addition, Barron was apprehended following the Sun Ray incident. At the time of his arrest, Barron possessed a Glock rifle, and ballistics evidence showed that the Glock was fired at Sun Ray Market. The Government also argues that Barron's defense—that it was merely coincidental that he was with Cunningham and in possession of the Glock hours after the shooting—is highly suspect.

It is not inconceivable that the jury could have convicted Barron on the Sun Ray counts even if it had never heard the unredacted 911 tapes and rejected Williams' testimony. However, even if we find the untainted evidence against Barron to be overwhelming, we could not find the error harmless for this reason. Rather, we must determine whether the error affected the jury's verdict.

Relying on our decision in *Smart*, the Government attempts to equate the applicable effect-on-the-verdict inquiry with an overwhelming evidence inquiry. Although, in *Smart*, we stated that if "the lawful evidence against the defendant is overwhelming and the trial error is not a fundamental one, the error should be deemed harmless," 98 F.3d at 1391, we also emphasized that "the harmless error test we apply here is not a mere sufficiency-of-the-evidence inquiry." *Id.* In deeming the error at issue in *Smart* harmless, we emphasized that "[t]he totality of properly admitted evidence [against the defendant] was weighty and not at all ambiguous," that "[m]oreover, there was a virtual absence of exculpatory evidence," and that

"[m]ost importantly, it [was] excruciatingly clear that the jury did not believe [the defendant's] story." *Id.* at 1390–91. We further emphasized that where "the evidence presented at trial is ambiguous, even a relatively minor error requires reversal." *Id.* at 1391–92; *see also O'Neal*, 513 U.S. at 437, 115 S.Ct. 992 ("[W]here the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error," the judge cannot find the error to be harmless.).

Thus, although "[o]f course, in deciding whether an error has had a substantial influence on the jury, a reviewing court cannot help but look at the totality of lawful evidence presented at trial," *Smart*, 98 F.3d at 1391 (citing *Kotteakos*, 328 U.S. at 763–64, 66 S.Ct. 1239), *Smart* makes it clear that the appropriate inquiry is an effect-on-the-verdict test and not a guilt-based test: "[I]n a case where the evidence at trial is conflicting or ambiguous, *the danger that an error will affect the jury's verdict* is almost always substantial." *Id.* at 1392 (emphasis added). *See also id.* ("[I]f the other evidence presented in this case had been *even slightly* ambiguous, we would be required to reverse Smart's conviction.") (emphasis added). Indeed, even where erroneously admitted evidence is apparently cumulative of lawful evidence, if it is "at least debatable" that the erroneously admitted evidence "tipped the scales" towards a guilty verdict, a reviewing court should not deem the error harmless. *Pryce*, 938 F.2d at 1349–50. This is consistent with the rule that a constitutional error will not be deemed harmless unless the Government shows "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24, 87 S.Ct. 824. Where the evidence is even slightly ambiguous or conflicting, or where the error at issue may otherwise have tipped the scales towards a guilty verdict, the Government is unable to make such a showing, and the verdict must be reversed.

We find that the evidence against Barron for the Sun Ray shootings, absent Williams' testimony as bolstered by the 911 tapes, is not free from ambiguity. As Barron argues, Romeo Williams' eyewitness testimony was

central to the Government's case against Barron for the Sun Ray charges. Although the jury arguably could have found Barron guilty even absent the error, the remaining evidence implicating Barron for the Sun Ray shootings is not so overwhelming as to compel us to conclude that the error did not affect the jury's verdict. Therefore, we reverse the jury's verdicts finding Barron guilty for the following charges arising from the Sun Ray incident: assaulting Bernice Douglas (count 56), assaulting Nefertari McCree (count 57), and possessing a firearm during a crime of violence (count 60). Count 61, charging Barron with possession of a firearm with an obliterated serial number, also arose from the Sun Ray incident. However, this charge arose solely from Barron's arrest following the incident; Williams' testimony and other information on the 911 tapes had no bearing on this charge. Accordingly, we do not reverse this conviction.

### 4. Barron's Remaining Convictions

■ Barron argues further that the erroneously admitted 911 tapes render *all* of his convictions invalid, not just those arising from the Sun Ray incident. We disagree.

■ The Government bears the burden of showing beyond a reasonable doubt that the error at issue did not contribute to the non-Sun Ray convictions. *See Chapman*, 386 U.S. at 24. In an effort to make this showing, the Government emphasizes that the 911 tapes came in accidentally *in relation to the Sun Ray incident* and did not pertain to any of the non-Sun Ray charges. In addition, the Government highlights eyewitness identifications and other evidence implicating Barron for the other charges on which he was convicted.

Barron fails to argue that the untainted evidence implicating him in the non-Sun Ray charges was ambiguous, nor does he highlight any specific exculpatory evidence exonerating him on the other charges. Rather, Barron offers two theories linking the taint of the error at issue to all of the charges against him. First, he argues that ballistics evidence links all of the charges together, and, thus, if the jury were to find Barron guilty for the Sun Ray shootings, the weap-

ons used at Sun Ray link him to the other incidents as well. Second, he argues that the prosecution's trial theory emphasized that Cunningham and Barron were together engaged in a series of armed robberies, assaults, and murders throughout the summer in question, and that a finding that Barron joined Cunningham in the Sun Ray shootings supports this *modus operandi* theory. In essence, Barron argues that the jury's finding against Barron for the Sun Ray charges, in the context of the prosecution's overall theory of the case, served as additional evidence against Barron for the remaining charges. Thus, Barron argues, if we assume that, absent the inadvertent admission of the unredacted tapes, the jury would have acquitted Barron of the Sun Ray shootings, the error must be deemed to taint all of the convictions against Barron.

We are unable to find that the error affected the non-Sun Ray verdicts, in light of the Government's showings and Barron's failure to highlight any specific evidence conflicting with the evidence against him or to otherwise argue that the Government's case against Barron for the non-Sun Ray charges was somehow ambiguous. *Cf. Smart*, 98 F.3d at 1390–92 (finding error harmless where evidence against defendant was unambiguous, there was a virtual absence of exculpatory evidence, and it was "excruciatingly clear" that the jury did not believe the defense story; but stating that if the evidence had been ambiguous or conflicting, the harmless error standard would require reversal of even a relatively minor error).

Barron's claim that the information contained in the 911 tapes indirectly tainted the jury's non-Sun Ray verdicts is best construed as an argument that the error tipped the balance towards guilty verdicts on the non-Sun Ray charges. However, whether the Sun Ray verdicts might be construed as cumulative evidence against Barron with regard to the remaining charges in light of the on-going enterprise theories argued at trial is not dispositive under the applicable effect-on-the-verdict test. Rather, we must examine the trial record as a whole in order to determine whether the error at issue influ-

enced *this* jury to find Barron guilty of the non-Sun Ray charges.

Although the prosecution apparently tried to use ballistics evidence and *modus operandi* arguments to tie the Appellants together and to each of the incidents alleged, the jury did not appear to be swayed by these ongoing enterprise theories. Significantly, although the jury convicted both Appellants for the vast majority of the charges arising from the fifteen alleged racketeering incidents, it did not convict on the RICO charges. In addition, the jury acquitted Cunningham but convicted Barron of charges relating to the armed robbery of Officer Barnes and the Horace and Dickie's armed robbery, and acquitted Barron but convicted Cunningham of the charges relating to the Sibley Plaza armed robbery, even though Appellants were charged as having committed these crimes jointly. It appears plain that, contrary to Barron's arguments regarding the influence of the prosecution's ongoing enterprise theories, the jury was able to sift and sort through the evidence pertaining to each incident in order to determine Appellants' respective guilt for each charge alleged. Thus, we find Barron's argument that the inadvertent submission to the jury of the unredacted 911 tapes tipped the balance towards guilty verdicts on the non-Sun Ray charges unpersuasive. Accordingly, we decline to reverse Barron's non-Sun Ray convictions.

### C. *Merger of Various Convictions for Sentencing Purposes*

#### 1. *Merger of Various D.C. Offenses*

As the Government concedes, each Appellant's two convictions for armed robbery arising out of the Sammy's Liquor incident (counts 31–32) should merge into one, since Appellants robbed only the liquor store and not its employees. *See United States v. Canty,* 469 F.2d 114, 126–27 (D.C.Cir.1972) (four tellers, but only one bank, robbed; only one conviction).

In addition, as the Government concedes, each Appellant's armed robbery convictions arising from the Fair Liquor incident (counts 47–49) should merge with their felony murder convictions (counts 50–51), because the indictment specified the armed robberies as the predicate for the felony murder counts. *See Catlett v. United States,* 545 A.2d 1202, 1219 (D.C.1988).

#### 2. *Merger of Section 922(g) Charges*

 All eight of Cunningham's convictions under 18 U.S.C. § 922(g) (counts 7, 17, 22, 26, 38, 54, 59, 67) should be merged into one. Contrary to the Government's suggestion, this is not merely a sentencing issue. Rather, the issue turns on whether the jury found all of the elements necessary to convict Cunningham for eight separate 922(g) charges.

 When a felon possesses multiple weapons, only one offense is committed, unless the weapons are stored or acquired at different times or places. In other words, where there is more than one charge under section 922(g), separate acquisition and storage of the weapons is an element of the crimes charged. Although the language of section 922(g) does not expressly require a finding of separate acquisition and storage in order to convict a defendant for multiple 922(g) charges where the possession of multiple weapons is alleged, courts have read this element into section 922(g). *See United States v. Szalkiewicz,* 944 F.2d 653, 654 (9th Cir.1991) (citing *United States v. Valentine,* 706 F.2d 282, 294 (10th Cir.1983) and *United States v. Frankenberry,* 696 F.2d 239, 245 (3d Cir.1982)).

Uncertainty as to the unit of prosecution intended by Congress in section 922(g) exists because of the use of the ambiguous word "any" in defining the crime. 18 U.S.C. § 922(g) ("It shall be unlawful for [a convicted felon] ... to receive *any* firearm or ammunition which has been shipped or transported in interstate or foreign commerce.") (emphasis added). As the Tenth Circuit explained in *Valentine,* judicial construction of such statutes is guided by the Supreme Court's decision in *Bell v. United States,* 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955). *See* 706 F.2d at 292–94. In *Bell,* the Court held that only one offense under the Mann Act, 18 U.S.C. § 2421, occurred where the defendant transported two women across

state lines on the same trip and in the same vehicle. *See* 349 U.S. at 82–83, 75 S.Ct. 620; *see also* 18 U.S.C. § 2421 (making it a felony to transport in interstate commerce "*any* woman or girl for the purpose of prostitution . . . .") (emphasis added). The Court explained that Congress "has no difficulty in expressing" its will "when it has the will . . . of defining what it desires to make the unit of prosecution and, more particularly, to make each stick in a faggot a single criminal unit. When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be decided in favor of lenity." *Bell*, 349 U.S. at 83, 75 S.Ct. 620; *see also Valentine*, 706 F.2d at 293 & n. 10 ("When a convicted felon simultaneously possesses two guns, . . . the definition of the offense . . . as possession of *any* firearm permits both the conclusion that only one offense has been committed and the conclusion that two separate crimes have occurred.") (citing *Bell* and listing cases in which circuits have held section 922 to require a finding of separate acquisition and storage in order to uphold multiple weapon possessions convictions).

■ Whether the weapons were separately acquired or stored is a question of fact for the jury, not a question of law for the court. *See United States v. Gaudin*, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (because materiality is an element of a violation of 18 U.S.C. § 1001, the Fifth and Sixth Amendments require that a conviction thereof rest on a *jury* finding of materiality); *United States v. Dale*, 140 F.3d 1054, 1056 (D.C.Cir.1998). In this case, the jury was never instructed to find that the weapons were separately acquired or stored in order to convict on each section 922(g) charge, and thus these convictions must merge into one.

### III. Conclusion

For the reasons explained above, we reverse Barron's convictions on counts 56, 57, and 60. Appellants raised several other challenges to their convictions, all of which have been considered by this court and found to lack merit. Therefore, the District Court judgment is affirmed with regard to the remaining convictions.

However, as explained above, various of Appellants' convictions should have been merged for sentencing purposes. Accordingly, we remand to the sentencing court for resentencing consistent with this opinion.

*So ordered.*