Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 14, 2010        Decided July 2, 2010

No. 06-3185

UNITED STATES OF AMERICA,
APPELLEE

v.

ROBERT L. HALL, JR.,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 05cr00030-01)

———

*Lisa B. Wright*, Assistant Federal Public Defender, argued the cause for appellant. With her on the brief was *A. J. Kramer*, Federal Public Defender.

*Suzanne G. Curt*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Roy W. McLeese III*, *Mary B. McCord*, and *Steven J. Durham*, Assistant U.S. Attorneys.

Before: HENDERSON, ROGERS and GARLAND, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Robert L. Hall, Jr. was convicted by a jury of operating a "Ponzi" scheme[1] for more than two years involving over a million dollars in which more than seventy investors lost all or a large portion of their investment. He challenges his conviction primarily on the ground that the district court failed to conduct an adequate inquiry to determine whether his waiver of his right to counsel under the Sixth Amendment to the U.S. Constitution was voluntary and knowing. Specifically, he maintains the inquiry failed to dispel his belief that his counsel was unprepared for trial. We hold that the district court's inquiry was constitutionally adequate because the district court's findings that Hall's decision to represent himself (with standby counsel) was knowing and voluntary met the criteria in *Faretta v. California*, 422 U.S. 806 (1975), for determining when a defendant may exercise his constitutional right to forgo his right to counsel. Viewing the proceedings as a whole, we reject Hall's assertion that he faced the constitutional dilemma of choosing between representing himself or accepting unprepared counsel. The district court's colloquy with Hall addressed his complaints by identifying Hall's false premise regarding discovery and by explaining how

---

[1] A "Ponzi" scheme is a scheme in which "some early investors are paid off with money put up by later ones in order to encourage more and bigger risks." Merriam-Webster's Collegiate Dictionary 905 (10th ed. 1993). *See also Belizan v. Hershon,* 495 F.3d 686, 689 (D.C. Cir. 2007); *Cunningham v. Brown*, 265 U.S. 1, 7–9 (1924) (describing the "remarkable criminal financial career of Charles Ponzi").

Hall's generalized complaints did not indicate defense counsel would not provide effective assistance.

We are further unpersuaded by Hall's contentions that a reversal of his conviction is required because plain error occurred when the prosecutor's erroneous closing argument allegedly affected the jury's understanding of the elements of mail, wire, and District of Columbia Code fraud, and when the district court constructively amended the indictment by instructing the jury on a third type of securities fraud not charged in the indictment. As to each error, Hall has failed to show a likelihood that the error affected the verdict or seriously affected the fairness, integrity, or public reputation of judicial proceedings. Regarding closing argument, the jury was instructed that arguments of counsel are not evidence and on the elements of the charged offenses. Regarding the third type of securities fraud, the jury necessarily had to find Hall engaged in a scheme to defraud to convict on the mail, wire, and D.C. fraud counts, and the evidence of his guilt was overwhelming.

However, as the government concedes, Hall's challenges to his sentence, save one, require a remand for resentencing. Accordingly, we affirm the judgment of conviction but remand the case to the district court for resentencing.

**I.**

The indictment alleged that from February 2001 to October 2003, Hall operated a Ponzi scheme through First United Financial Group, LLC, which Hall owned and operated. The scheme involved soliciting funds from investors by promising high rates of return on investments in properties to be developed for the benefit of low and middle-income African-Americans in the District of Columbia. The government's evidence showed that Hall made false representations to the investors, promised

them extraordinarily high rates of return, made no real estate investments, and used money received from later investors to pay initial investors and to sustain the scheme. Hall was indicted on six counts of mail fraud and ten counts of wire fraud, in violation of 18 U.S.C. §§ 1341, 1343; *id*. § 2, one count of securities fraud, in violation of 15 U.S.C. §§ 77q(a), 77x, and one count of first degree fraud, in violation of D.C. Code §§ 22-3221(a), 22-3222(a)(1); and was subject to forfeiture of $747,169 allegedly obtained by mail or wire fraud, pursuant to 18 U.S.C. § 982(a)(2)(A).

Ten investors in First United who had entered into "asset placement agreements" calling for a set rate of return and payment schedule testified about representations made to them by Hall regarding First United, what if any payments they received, and their efforts to recover their principal. According to Hall's website, which he encouraged potential investors to read, First United was

> [o]ne of the fastest growing consulting firms in the Washington DC area . . . and has quickly positioned itself as a financial services powerhouse, with a strong focus on educating working class citizens. The keys to the firm's success are effective education and consultation methods, complimented [sic] by the proactive development of client-friendly solution systems. These services are designed to assist clients for whom professional wealth building consultation was previously unaffordable. First United . . . envisions that its superior client education systems will secure its place as the icon in financial services for citizens who have been historically disenfranchised from the information that safeguards their financial future.

Gov't. Ex. 18. The website included Hall's photograph, showing a serious looking bespectacled young man in a business suit, who was described as "the twenty-nine year old President & CEO of a multi-million dollar DC based consulting firm," who came from "humble beginnings" to "quickly ris[e] to national prominence as a young leader in the African-American community." *Id.* The web site stated Hall was "[a] decorated Army veteran and former paratrooper." *Id.*

Fairly typical of other investors' experience was that of United States Army Warrant Officer William McClain. He was contacted by Hall and First United employee Carletus Willis and told that First United used investor money to renovate properties in low-income neighborhoods in the Trinidad section of Washington, D.C., thereby benefitting African Americans by providing affordable housing and its investors by paying high rates of return. Hall told McClain he would be able to retrieve his investments, and that other investors had received their principal and interest. McClain received a six-page "prospectus" about the Trinidad project, a condominium conversion realty solution for those displaced by "gentrification." It stated that "by assembling and representing a $21 million investment Buyer Pool (IBP), our firm [First United] acts as the facilitator of a community friendly real estate development system which provides affordable housing to low and moderate income earners."

On four occasions McClain invested $27,000. His first two investments, both $5,000, promised the return of principal plus sixty percent interest in six months. McClain's wife also invested. When payment was not forthcoming, McClain received letters from First United stating that there had been a banking error delaying the checks and that First United was going to sell property to avoid liquidity problems. With Hall's encouragement, McClain reinvested his principal and the profits

he thought he had earned.  When he contacted Hall because he had not received any payments, Hall drafted a payment plan calling for payment in two weeks.  McClain never received the payments.  He also received no response to his October 2003 letter demanding payment.  McClain and his wife lost all they had invested in First United.  Hall never informed McClain that First United owned no real estate or had no assets to liquidate.

Similarly, Hall induced Villet Gethers, a graduate student at Howard University, to invest $7,000, telling her his investors were happy, she would lose no money, and that the return of her principal was "guaranteed."  He promised her an annual return of seventy-two percent and offered to pay her a commission for every new investor she recruited.  Hall told Gethers he had attended Howard University, had experience in finance, and had community responsibilities and insights as an Advisory Neighborhood Commissioner.  Gethers lost approximately $4,000 dollars. [2]

---

[2]  Other investors who lost money in Hall's fraudulent schemes also testified:

-Mary Perkins (a nursing assistant according to the government's brief) recovered only $2,000 of the $10,000 she invested with First United.

-Walter Boone, a retired Postal Worker on disability pay, invested $4,000 of his retirement funds after attending a seminar at which Hall spoke.  He was friends with an employee of First United and invested because he was "strapped for money" to pay bills following knee surgery.  Tr. 2/21/06 at 179.  Boone lost $2,000.

-Likewise, Dr. Melody Ivory, a professor of computer science, and her husband lost $12,500 after investing in First United on the basis of Hall's enthusiastic representations about First United's performance, his commitment to the African American community, and his friendship with Dr. Ivory's friend.  When she demanded her money, Hall drove her around the city, pointing to several properties

he claimed First United owned and described a building that was being renovated by First United Construction LLC as part of the Trinidad project. Dr. Ivory invested $30,000, and was promised $72,000 from Hall after six months. Instead, she lost $5,500.

-Christian Downward (a government contractor according to the government's brief) invested $30,000 and received nothing back. Hall had promised his principal was safe and would be returned if there was no property in which to invest. When Downward did not receive his payments, Hall claimed an employee had embezzled First United funds.

-Kimberly Williams, who had a dual undergraduate degree in economics and business, lost over $21,000 after entering asset payment agreements in November 2001 and September 2002. She initially received interest payments, which induced her to reinvest and add to her principal with First United. According to Hall, her money would be invested in the Trinidad project and he had "expertise" through First United Construction. He also told Williams that the Trinidad project was going well and First United was about to move buyers into other properties. When nonpayment started in the fall of 2002, Williams received a letter from First United discussing liquidity problems.

-Loryne Bowen, a nurse, lost all of the $9,634 investment she transferred to First United from her retirement fund. She had heard Hall speak at First United's offices on Connecticut Avenue, N.W.; Hall described himself as an avid follower of Marcus Garvey's philosophy, claiming that he had handled finances and bookings for a number of religious and musical groups. Hall assured her an investment posed no risk.

-Denise Dicks-Cook, an executive assistant seeking money for her two children's tuition costs, invested $22,000, the proceeds of her deceased husband's life insurance policy. She was prompted to invest by Hall's biography, the Trinidad project prospectus, and her discussions with Hall and Carletus Willis, the First United employee, about the needs of the African-American community. As a result of Hall's discussions with her about the Bible and her religious beliefs, Dicks-Cook trusted Hall and was convinced he was a "Christ-like" person with good intentions.

Two former employees of First United described its operations. Carletus Willis described First United's relentless focus on recruiting new investors rather than acquiring property. According to Willis, First United acquired no property. Money to pay early investors came from funds received from later investors, not from real estate investments. Investors' money paid First United's operating expenses, but it was not current on its utilities bills and its checks bounced even as Hall was driving a new Mercedes. Hall told Willis how to solicit business and what to tell investors about the Trinidad project. Willis was aware that the representations he was making to investors were false. When investors complained about not receiving interest payments they were sent a letter stating that property would be sold to pay investors; Hall personally signed the letters. When Willis voiced his discomfort with the operation, Hall complained Willis was not bringing in as much capital as he previously had. Willis also testified that although First United maintained a "virtual office" at 1050 Connecticut Avenue, N.W. (based on space rented at an hourly rate), its actual office was located in Hall's residence.

Lamont Bessicks, Jr., who worked for First United from June to November 2002, testified that Hall had developed the concept for the Trinidad project but it was never implemented. Bessicks had been hired by Hall to locate properties to develop into low and moderate income housing. But while he had repeatedly presented Hall with projects, Hall never came up with the required deposit funds. According to Bessicks, First United made no offers to buy properties in the Trinidad neighborhood

-William Mann, a retired police officer, lost 100 percent of his $10,000 investment. He testified that Hall assured him that the return of his principal was guaranteed and at worst he would not receive interest.

and it never sought financing or developed construction plans for any properties. Further, the statements in the prospectus that First United had a $21 million investment pool and had provided housing in the community were false. When Bessicks' own payroll checks began bouncing, he quit.

An expert witness described marketing fraud schemes for the jury, including the nature of Ponzi schemes. He estimated, based on a random sample of asset placement agreements, that the average annual interest rate promised to the investors was 153.6 percent. The postal inspector who conducted the investigation testified that the 70 investors who had responded to a government questionnaire had lost approximately $747,000 in principal. Bank records showed that over $214,000 was withdrawn from First United's account in cash, checks made payable to cash or Hall, or by transfers to Hall's personal bank account.

In his defense, Hall, representing himself, presented five investors, in addition to a First United Construction employee, a First United employee, and a real estate developer. The investors testified that Hall had spoken to them about the risks involved with the investments and that there was a high rate of return in exchange for the risk and the lack of backing by the FDIC. They also testified that they had received the promised return on their investment. One of the witnesses, Reverend Tommy Jackson, testified that Hall had told him that the money was offered at a higher rate of return because the project had not started and they were in desperate need of capital. Hall also testified himself, with questions posed by his standby counsel, claiming he acted in good faith. He claimed that he had paid over $300,000 to investors out of $400,000 taken in during 2002 and that he had intended to pay the rest of the investors. He also claimed that the literature about the Trinidad project represented intentions to buy real estate and that he had not represented to

investors that real estate had already been purchased. He admitted, however, that he had never told investors he did not have sufficient funds to purchase real estate and that First United did not have any properties to liquidate, as the letters to investors stated.

The jury convicted Hall on all counts and found by a preponderance of the evidence that the proceeds from the mail and wire fraud amounted to $747,169. The district court sentenced Hall to 188 months' imprisonment, followed by three years' supervised release, and ordered Hall to pay $713,924 in restitution and to forfeit $747,169.

## II.

On appeal, Hall contends he did not make a knowing, intelligent, and voluntary waiver of his Sixth Amendment right to counsel. He maintains that the district court's inquiry regarding defense counsel's preparation for trial was inadequate to dispel Hall's belief that defense counsel was unprepared to render effective assistance and so induced an involuntary waiver. Because his specific concerns were never addressed, and defense counsel's responses that he was prepared to proceed to trial did nothing to alleviate the constitutional dilemma Hall faced, Hall maintains reversal is required: "It is not possible to voluntarily choose to waive counsel when your alternative is unprepared counsel." Appellant's Br. 17.

In *Faretta*, 422 U.S. 806, the Supreme Court held that in a criminal prosecution a defendant has a constitutional right to proceed without the counsel guaranteed by the Sixth Amendment when he voluntarily and intelligently elects to do so. However, the Court did not shy away from acknowledging that "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by

their own unskilled efforts." *Id*. at 834. Because an accused who manages his own defense "relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel," the Court imposed a precondition to self-representation: "[I]n order to represent himself, the accused must 'knowingly and intelligently' forego those relinquished benefits." *Id*. at 835 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464–65 (1938)). The Court placed a responsibility on the trial court to ensure this right by conducting a colloquy: "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with his eyes open.'" *Id*. at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)) (amended on denial of reh'g, 1943).

The colloquy addressing Hall's concern that defense counsel was unprepared for trial took place on January 30, 2006, the date set in July 2005 for pretrial motions before the February 6, 2006 trial date. At the start of the hearing, defense counsel described the circumstances of his filing on Saturday, January 28, 2006, a motion for a continuance on the ground that defense counsel "is not prepared to proceed with the trial . . . on its currently scheduled date" and "cannot represent to this court that he is adequately prepared to zealously defend Mr. Hall." Def.'s Mot. For Continuance at 2. Defense counsel advised the district court that since his appointment in April 2005, he had opportunities to review the information provided by the government and he had learned that Hall "had a particular idea of how it is he wished to defend this case from the outset of my representation of him." Tr. 1/30/06 at 4. Defense counsel stated that his office "ha[d] attempted to prepare a defense, given the representations made by Mr. Hall, and in fact our

agreement during the early part of our . . . attorney-client relationship." *Id.* Defense counsel noted that he had received the "bulk" of discovery he had requested and that he anticipated receiving further information about the government's witnesses and Jencks information that day. However, defense counsel explained, on Saturday, January 28, after he and Hall had reviewed a renewed plea offer and some of the information from the government,

> Mr. Hall represented to this counsel, and this counsel agreed based upon what it is that he was saying at that time, that he did not feel that we were ready to proceed with trial. Although that was not my original position prior to our meeting. Mr. Hall, originally when counsel was appointed, represented that he wished to in some respects represent himself, and that he viewed counsel as a advisor of sorts to Mr. Hall, who was prior to my appointment, and even at the time of my appointment, prepared to represent himself. Upon discussion and agreement between counsel and Mr. Hall, we determined that Mr. Hall in fact could not represent himself but as all criminal defendants do have, he would have the right to testify in the trial to illuminate some of the issues he thought would be illuminated originally more effectively if he was representing himself. Mr. Hall had agreed with counsel that [representing himself] . . . would not be the best way to proceed. But after having met with counsel on Saturday [January 28] and hearing how it is that counsel intended to proceed in terms of the defense of this case, Mr. Hall again revisited the issue of representing himself. Counsel . . . talked to Mr. Hall about that option. Mr. Hall agreed with counsel that if counsel were to request a continuance, that he would then withdraw from that position that he wished

> to represent himself and that we would come here before the court and make these representations, and then Mr. Hall would make a decision about . . . his role in the defense.

*Id*. at 5–6.  Defense counsel then advised the district court regarding Hall's position on January 28 that "[b]ased on my conversation with Mr. Hall and how it is that he intends now to defend the case, I don't feel as if I am prepared to do what it is that Mr. Hall is now asking me to do, in light of the information that we now have in our office."  *Id*. at 6–7.

The district court denied the motion for a continuance, noting points made in the government's opposition reciting Hall's efforts to delay his trial.[3]  Turning to the question of

---

[3]  In addition to arguing the two grounds stated for a continuance were meritless, the government's opposition to the "11th hour" January 28, 2006 motion for a continuance stated that after Postal Inspectors searched First United's offices and seized incriminating documents in October 2003, Hall applied in June 2004 for Criminal Justice Act representation and an Assistant Federal Public Defender was appointed to represent Hall.  The prosecution gave defense counsel discovery and tendered a plea offer.  At Hall's request, the plea deadline was extended several times.  In October 2004, Hall "abruptly terminated" his counsel's services and retained attorney Pamela Bethel.  The prosecution gave her discovery, access to seized documents, and an extension on the plea offer.  The plea deadline was extended several more times at Hall's request and then rejected after two months had elapsed.  In the interim, in December 2004, Ms. Bethel and another attorney representing Hall were given access to the materials seized by the Postal Inspectors and they spent two days reviewing and copying search warrant materials.  The grand jury returned its indictment on January 18, 2005.  The next day the prosecutor filed a trial memorandum outlining in detail what the evidence would show and the witnesses the government intended to

whether Hall would seek to represent himself, the district court noted that, although Hall had a right to represent himself and Hall was not an uneducated person, it did not "believe that a criminal defendant's interests are best served by representing himself, because of all the rules and principles which the court must enforce during the trial, which a criminal defendant may not be aware of." Tr. 1/30/06 at 12. Defense counsel, upon conferring with Hall, advised that Hall would be making a request to dismiss counsel and represent himself. At that point the district court conferred *ex parte* with Hall and defense counsel.

Hall told the district court that his complaint was not related to any failures of the government to provide discovery but rather that although defense counsel "is a great attorney," he believed his counsel "is not adequately prepared" for trial. *Id*. at 15. Hall stated that he "lived through those years" and knew "how much information . . . they have to work with." *Id*. He reasoned his counsel was unprepared from the fact that counsel "ha[d] only spent less than say two hours a month" meeting with Hall. Moreover, "it took some 12 federal agents nine hours to collect boxes and boxes of documents and other physical evidence, which are in Columbia, Maryland," yet his counsel, Hall asserted, had "never been to the room where that information is." *Id*. Hall further claimed "[t]here is exculpatory evidence, in my opinion, there that has not been submitted by

---

call at trial. When Hall first appeared on January 28, 2005 before the district court to which the case was assigned for trial, he was without counsel, advising the district court he did not have funds to retain his private counsel and he requested 45 to 60 days to retain counsel. The district court continued the proceedings until February 28, and then again until April 12, 2005. On that date, when Hall appeared without counsel, the district court appointed defense counsel to represent Hall.

the government to [defense counsel]," such as videotapes and cash receipt books, and that evidence had not been requested by defense counsel. *Id*. at 15–16. Hall also stated, "[w]e have no witnesses that I know of" and no evidence to present, while the government had volumes of documentation and expert witnesses. *Id*. at 16. Then, clarifying that he was not "of the opinion that I should definitely represent myself," Hall told the district court that he did not "feel that it would be appropriate to go forward, given the level of representation of a good attorney. And I would rather dismiss him as my attorney than go forward with an ill-prepared attorney." *Id*. In response to the district court's question whether he was asking for the appointment of new counsel, Hall responded "that would probably be the smartest thing[] for [me] to do." *Id*. at 17.

Turning to defense counsel, the district court asked for his response. Defense counsel began by observing that "I just think we disagree about the level of preparation that has been done." *Id*. at 17. Explaining their planned schedule of meetings did not materialize because of conflicts with their work schedules, defense counsel advised that "during that time I became familiar with the information that had been presented by the government." *Id*. at 17. Defense counsel stated that he had reviewed some of the information he had obtained from the government with Hall and knew what evidence and information he would be able to use in the defense. Defense counsel assured the district court that he was "very familiar with the information[,] familiar with most of the players[,] . . . and felt prepared really to go to trial." *Id*. at 17–18.

The district court denied Hall's motion to dismiss defense counsel and appoint new counsel to represent him. First, the district court identified Hall's misunderstanding about discovery. By way of introduction, the district court stated that it could not and did not know what Hall was referring to in

terms of evidence he was aware that the government had that defense counsel had not requested, or in terms of what Hall thought defense counsel should know that counsel did not. The district court explained to Hall, however, that what it did know from what the prosecutor and defense counsel had said is that Hall "seem[ed] to . . . operate on a false premise, which is that the government is required to give you all the information that you think it should." *Id.* at 18. The district court advised Hall that the government had no such obligation beyond Rule 16 of the Federal Rules of Criminal Procedure. Noting Hall's apparent confusion about this, the district court advised Hall that this was one reason the court did not think it was a good thing, even for a "very knowledgeable" person, to represent himself. *Id*. at 19. Second, the district court explained to Hall that defense counsel stated he had received from the government all of the information to which he believes he is entitled, and that nothing Hall had said suggested otherwise. The district court advised Hall the prosecutor had stated that the government disclosed more than was required under the rule. Third, regarding Hall's concern about witnesses, the district court explained that a lack of witnesses alone did not indicate defense counsel should be removed as unable to provide effective assistance and new counsel appointed, because "perhaps" there are no witnesses who could testify. *Id.* Finally, the district court informed Hall of how it evaluated the situation. Observing that Hall "wishes very much not to have the trial go forward, . . . [and] basically wishing to do whatever is necessary in order . . . to accomplish a delay of the trial," the district court informed Hall that a desire for delay was not an appropriate basis to grant his request. *Id*.

The district court then inquired whether Hall had any other requests. Hall requested that he be allowed to represent himself and that defense counsel be appointed as an advisor. Further *ex parte* inquiry established that Hall wanted defense counsel to

act as standby counsel.  The district court then posed a series of questions in open court[4] and determined that Hall's waiver of his Sixth Amendment right to counsel was made knowingly, intelligently, and voluntarily, and appointed defense counsel as standby counsel.

On appeal, Hall maintains the district court failed adequately to inquire into his request for new counsel, pointing to the lengthy inquiry in *United States v. Cunningham*, 145 F.3d 1385 (D.C. Cir. 1998), in which the district court dispelled the factual misunderstanding that was the basis for the defendant's

---

[4] Hall informed the district court that he was thirty-two years old, had attended more than three years of college at Howard University majoring in international business and received good grades when he had attended classes, and that he did not suffer from any mental or emotional problem that would prevent him from representing himself.  When Hall responded he had no prior criminal conviction and had not studied criminal law, the district court addressed once again the "many disadvantages of self-representation," *id*. at 32, and how a lawyer would be knowledgeable of the principles of criminal law and procedure to apply at trial.  Hall responded that he understood, as the district court put it, that he "will be disadvantaged by that ignorance." *Id*. at 33.  Hall acknowledged he was not familiar with the Federal Rules of Evidence "at this time," *id.* at 33, or the Federal Rules of Criminal Procedure "at this time," *id.* at 34.  The district court again advised Hall that "a trained lawyer would defend you far better than you could defend yourself," that "it's unwise of you to represent yourself," and that the court "strongly urges you not to try to represent yourself." *Id.* at 34.  Hall responded that he understood and, notwithstanding all the district court had said, confirmed that his decision to represent himself was entirely voluntary.  In reassuring the district court that he wished to represent himself Hall added, "provided that I have the assistance of [defense counsel]." *Id*. at 35.

complaints about his counsel. Hall appears to take the view that he could not exercise free will when he believed defense counsel to be unprepared for trial, and contends that nothing in the record objectively contradicted that belief. *See* Appellant's Br. 22–23. In *Faretta*, 485 U.S. at 834, the Supreme Court instructed, however, that to conclude a defendant's decision to waive the right to counsel is "intelligent" does not mean that it must be perceived as reasonable or wise, 485 U.S. at 834. And in *Cunningham*, 145 F.3d at 1388, this court warned that "[w]here a defendant's complaints lack merit, a court cannot allow itself to be manipulated into granting a continuance and appointing new counsel just to placate a defendant threatening to represent himself." Rather, where the defendant elects to represent himself because he believes trial counsel is unprepared, the district court "must evaluate the defendant's objections to ensure that the self-representation election is voluntary" and not the result of a "Hobson's choice." *Cunningham*, 145 F.3d at 1392.

In *Cunningham*, this court held that the district court's colloquy with the defendant was sufficient where the district court had uncovered that the defendant's dissatisfaction was based on a factual misunderstanding and had "repeatedly assured Cunningham of [the court's] confidence in" his attorney after finding that Cunningham's complaints "plainly lack[ed] merit." *Id*. Similarly to *Cunningham*, the district court uncovered and addressed the false premise underlying Hall's concern that defense counsel was unprepared for trial. The district court was now cognizant of representations by the prosecutor and defense counsel about discovery as well as defense counsel's explanation for filing the motion for a continuance so close to the long-set trial date and his representations about his preparedness for trial, and concluded that Hall's complaints about defense counsel reflected a misunderstanding regarding discovery. Although Hall had

disclaimed that he was making any argument that the government had not turned over what it was "supposed to," *id.* at 15, his complaint that defense counsel did not request access to unidentified additional documents revealed a misunderstanding of the legal futility of such a request. The district court explained the nature of the misunderstanding to Hall and advised him that his complaints provided no basis to conclude defense counsel would render ineffective assistance of counsel, much less adequate reason to delay the start of trial so new counsel could be appointed.

The record supports the district court's conclusion. Although the statement in the motion for a continuance lent support to Hall's assertion about defense counsel's unpreparedness due to the "volume of documentation," Def.'s Mot. for Continuance at 2, at the January 30 hearing defense counsel limited that statement by explaining that he was unprepared to proceed in the manner that Hall had suggested over the weekend in view of the evidence his office had, not that he was unprepared for the reasons Hall told the district court he believed defense counsel was unprepared for trial. *See* Tr. 1/30/06 at 5–7. In response to Hall's claim that defense counsel had not examined boxes of seized documents or asked for exculpatory items, the district court explained to Hall that the government had turned over everything required and that defense counsel advised the court he was "familiar" with that information and that Hall was not aware of the extent of his preparatory efforts. Tr. 1/30/06 at 10, 19; 17. Hall never identified specific documents that defense counsel had refused to make an effort to obtain, besides his general objection that counsel had not been to the room in Maryland where evidence was held. Neither did Hall indicate to the district court that there were potential witnesses that defense counsel had refused to interview.

Nevertheless Hall maintains that the district court was required to question both him and defense counsel more fully about the alleged lack of preparation. Doubtless the district court's inquiry might have proceeded further. For example, the district court did not ask defense counsel whether the lack of witnesses was a strategic choice or whether he had already reviewed all the relevant evidence or thought he could do so before the trial began in a week. The answers to these questions, however, were implicit in defense counsel's representations to the district court that he was familiar with the players and the information the government had provided. The district court might have explained to Hall why the court was confident defense counsel was prepared to render effective assistance, because he still had a week to review documents before trial. But Hall knew the scheduled trial date and had heard defense counsel inform the district court that he anticipated receiving additional materials from the government that day in anticipation of starting trial in a week. The circumstances in the cases Hall cites are readily distinguishable. Unlike in *Sanchez v. Mondragon*, 858 F.2d 1462, 1466 & n.6 (10th Cir. 1988), the district court allowed Hall to state the reasons for his belief that defense counsel was unprepared for trial and asked defense counsel to respond to Hall's complaints. And unlike in *Pazden v. Maurer*, 424 F.3d 303 (3d Cir. 2005), the government gave defense counsel access to discovery in a timely fashion and defense counsel stated that he was familiar with the information turned over by the government.

The extent of the *Faretta* colloquy with a defendant lies within the district court's discretion so long as the court addresses the core elements of the defendant's concern. The district court did so here. The district court properly recognized that Hall had a misunderstanding about the discovery that had taken place and defense counsel's review of that material. The district court had earlier informed Hall that it had appointed

experienced criminal defense counsel with whom the court was familiar professionally. The district court also explained why Hall's concerns about witnesses or the lack thereof was not a reason to dismiss defense counsel and appoint new counsel. Based on the factual context and generalized nature of Hall's complaints, the district court reasonably could conclude that Hall was simply trying to delay the start of his trial. Additionally, defense counsel's explanation for filing the motion for a continuance, which Hall did not dispute, indicated that Hall's dissatisfaction with counsel stemmed from a difference about trial tactics, not defense counsel's unpreparedness to meet his obligation under the Sixth Amendment to provide effective assistance of counsel. Where, as here, the record indicates a disagreement between the defendant and his counsel about trial strategy – as distinct, for example, from a disagreement about whether the defendant should testify at trial – the district court may properly view that as a matter for counsel to decide. *See Strickland v. Washington*, 466 U.S. 668, 690–91 (1984); *Pavel v. Hollins,* 261 F.3d 210, 217 (2d Cir. 2001); *cf. United States v. Moore*, 554 F.2d 1086, 1091 (D.C. Cir. 1976). Given the apparent lack of merit to Hall's complaints, a further inquiry was not constitutionally required.

Also unpersuasive is Hall's contention that his waiver of counsel was not knowing or intelligent because he was unaware of the guidelines range of 188 to 235 months to be used by the district court at sentencing. The district court emphasized to Hall the seriousness of the felonies with which he was charged and advised Hall that the initial guidelines estimate was conservative and could go up or down. Tr. 1/30/06 at 28, 31. Moreover, the prosecutor alerted Hall to the possibility of a sentence in excess of a hundred years' imprisonment if the sentences on each count were consecutive. *Id.* at 29–30. Hall responded affirmatively to the district court's inquiry whether

he understood and appreciated that he was charged with very serious felony offenses. *Id.* at 28; *see also id.* at 35. Hall's challenge to this aspect of the *Faretta* inquiry thus fails.

Accordingly, we hold that the district court's inquiry regarding the voluntariness of Hall's waiver of his Sixth Amendment right to counsel was constitutionally adequate. The record shows that Hall's request to represent himself, with the assistance of standby counsel, was granted by the district court only after the necessary *Faretta* inquiry regarding Hall's competence and intelligence to waive his right to counsel as well as his knowledge of the gravity of the charges against him and the disadvantages of self-representation.

## III.

Hall also contends that plain error occurred during both the prosecutor's closing argument to the jury and the district court's instructions to the jury on securities fraud. Because Hall did not object to either error during trial, he must show the error was plain, because it affected his "substantial rights" and "seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732–37 (1993). Hall fails to meet this burden.

## A.

As a representative of the United States, the prosecutor has a duty to see that "justice shall be done," and the average jury places confidence in the prosecutor's statements. *Berger v. United States*, 295 U.S. 78, 88 (1935). Yet during closing argument the prosecutor referred to three "independent bases" for conviction of mail, wire, and D.C. fraud, Tr. 3/2/06 at 11, 22, and told the jury that if it found Hall had lied "to one person one time, he can be found guilty of fraud," *id*. at 69. Although the securities fraud statute has three independent bases for

finding liability, 15 U.S.C. § 77q(a), the mail, wire, and D.C. fraud statutes impose liability only where there is a scheme to defraud.[5]  Hence, the prosecutor's closing argument purported to vitiate the scheme-to-defraud requirements of the wire and mail fraud statutes, and the scheme or systematic course of conduct requirements of first-degree fraud under District of Columbia law.  On appeal, the United States properly concedes the prosecutor's statement was error.  *See* Appellee's Br. 52. The question is whether this error prejudiced the outcome of Hall's trial, *see United States v. Venable*, 269 F.3d 1086, 1091 (D.C. Cir. 2001).

In determining prejudice, the court looks to "the centrality of the issue affected, the severity of the prosecutor's misconduct, the steps taken to mitigate the misconduct, and the closeness of the case."  *Id*. at 1091.  The error went to an element of the crimes charged.  However, the prosecutor told the jury to look to the district court's instructions on the law.  *See* Tr. 3/2/06  at 10–11, 68.  This reference to the forthcoming jury instructions could not alone remove the taint of the error, because  the error suggested an easy way to convict for a juror disinclined to examine the evidence in light of the instructions on the law.  But the district court instructed the jury both that arguments of counsel were not evidence and that to convict on the mail, wire, and D.C. fraud counts the jury must find a scheme to defraud beyond a reasonable doubt.  *See* Tr. 3/2/06  at 80, 89–94, 107.[6]

---

[5]  The mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, require proof of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  D.C. Code § 22-3221(a) requires proof of a "scheme or systematic course of conduct with intent to defraud." The securities fraud statute is discussed *infra* Part III.B.

[6]  For example, the district court instructed that to convict of wire fraud, the jury must find that Hall "knowingly devised or

The jury is presumed to follow the instructions. *See*, *e.g.*, *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). Given the jury instructions it is implausible to think, absent evidence to the contrary, that the jury took the prosecutor's erroneous argument to mean that to convict Hall it did not have to find a scheme to defraud, or otherwise to follow the jury instructions. *See Venable*, 269 F.3d at 1091.

Hall maintains, however, that the jury instructions were insufficiently curative because the district court should have alerted the jury to the prosecutor's erroneous statement of the law. This court has previously approved targeted instructions designed to mitigate prejudice. *See Bradley v. United States*, 420 F.2d 181, 187 (D.C. Cir. 1969). The court has observed that generic instructions may not be a cure-all for an erroneous statement, *see id.* at 188, noting that a specific curative instruction may be required in a particularly egregious case, *see*

---

knowingly participated in a scheme or artifice to obtain money or property by means of false and fraudulent pretenses" and that the defendant "did so with the intent to defraud." Tr. 3/2/06 at 89. The district court then instructed that a scheme or artifice "is merely a plan for the accomplishment of an object." Tr. 3/2/06 at 91. Similarly, the district court instructed that to convict of first-degree fraud under District of Columbia law, the jury must find, beyond a reasonable doubt, that the defendant was engaged in a scheme or systematic course of conduct, defining "scheme" as "any pattern of behavior calculated to deceive persons of ordinary prudence and comprehension." Tr. 3/2/06 at 107. To the extent Hall now argues the instructions were confusing, he points to nothing in the record, such as a note from the jury seeking clarification, and the jury is presumed to have followed the instructions; the record indicates that the jury had a copy of the instructions in the jury room during its deliberations.

*United States v. North*, 910 F.2d 843, 897–98 n.33 (D.C. Cir. 1990), and that contemporaneous objection to a specific erroneous statement can "fix[] the statement in the jury's mind as one subject to doubt," *Gaither v. United States*, 413 F.2d 1061, 1079–80 (D.C. Cir. 1969). This court has not yet held that the district court has a *sua sponte* obligation to alert the jury to the type of error that occurred here, either in the course of the closing argument or in the final instructions to the jury. The instant case does not warrant doing so. The district court instructed the jury on the "scheme" elements of the charged offenses, and that instruction was sufficiently curative, particularly when the erroneous argument was acknowledged by the prosecutor to be subject to the court's instructions, s*ee, e.g.*, *Venable*, 269 F.3d at 1091; *United States v. Catlett*, 97 F.3d 565, 573 (D.C. Cir. 1996). Unlike in *Bradley*, the government's evidence of Hall's involvement in a scheme to defraud was overwhelming, *see Venable*, 269 F.3d at 1092; *United States v. Webb*, 255 F.3d 890, 901 (D.C. Cir. 2001). We therefore conclude the error, although plain, did not prejudice the outcome of the trial or seriously affect the fairness, integrity or public reputation of the proceedings.

**B.**

Under 15 U.S.C. § 77q(a), securities fraud can be committed by (1) employment of any device, scheme, or artifice to defraud; or (2) obtaining money by means of any untrue statement of material fact or omission to state any material fact necessary to keep the statements made from being misleading, or (3) engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. The indictment did not charge Hall with the third way of committing securities fraud. However, the district court instructed the jury that it could convict Hall of securities fraud in any one of the three ways. Hall therefore contends that the indictment was constructively amended in violation of the

Grand Jury Clause of the Fifth Amendment to the U.S. Constitution, *see*, *e.g.*, *Stirone v. United States*, 361 U.S. 212, 215–18 (1960), and so erroneously reduced the government's burden of proof because he was unaware he had to defend against a third theory.

Hall maintains that to show plain error, as he must because he did not object to the instruction at trial, he need not show prejudice because the Constitution protects a defendant's right to be tried only on "charges returned by a grand jury," U.S. CONST. amend. V, and the violation of this fundamental right always affects substantial rights. *See Stirone*, 361 U.S. at 217–18. We need not decide this question. In *United States v. Cotton*, 535 U.S. 625 (2002), the Supreme Court avoided deciding whether this type of error affected the defendant's substantial rights because in that case the error did not "seriously affect the fairness, integrity or public reputation of judicial proceedings," the fourth prong of the plain error analysis. *Id*. at 632–33. The same is true here.

"[I]n most circumstances, an error that does not affect the jury's verdict does not significantly impugn the 'fairness,' 'integrity,' or 'public reputation' of the judicial process." *United States v. Marcus*, No. 08-1341, slip op. at 7, (U.S. May 24, 2010) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)). Hall has not shown this error affected the verdict. Although suggesting it was a close question whether Hall had engaged in a scheme to defraud and it was likely that the jury used the "easier" theory, Hall's appellate counsel was unable during oral argument to explain how it would have been easier for the jury to find Hall engaged in the third erroneously-instructed way of committing securities fraud than either of the other two ways. Nor can we. The district court instructed the jury that it could not convict unless it found that Hall acted "willfully, knowingly, and with the intent to defraud" regardless

of which theory it relied upon.  Tr. 3/2/06 at 98–99; *see also* 15 U.S.C. § 77x.  *United States v. Lawton*, 995 F.2d 290 (D.C. Cir. 1993), on which Hall relies, is distinguishable, for the amendment there allowed the jury to convict on facts that did not constitute a federal crime and the special verdict form indicated the jury convicted on that basis, *id*. at 294–95. Additionally, although claiming he focused his defense on rebutting the first two theories, Hall does not suggest he would have defended himself differently had he known the third theory was at issue. *See* Appellant's Br. 39.  Hall testified and he argued to the jury that he did not intend to defraud anyone, and the evidence against him was overwhelming.  And while he maintains the uncharged theory that the asset placement agreements' incorporation of D.C. law caused it to operate as a fraud was not something subsumed within the proof of the charged theories, *see id*. at 40, he overlooks the jury instructions that to convict on mail and wire fraud the jury had to find Hall engaged in a scheme to defraud.  *See supra* note 5.  Hall thus fails to show that inclusion of the third theory in the jury instructions  seriously affected the fairness, integrity, or public reputation of judicial proceedings.

## IV.

Finally, Hall contends that his sentence was procedurally and substantively unreasonable and he must be resentenced.  The district court sentenced Hall to 188 months in prison followed by three years' supervised release, and ordered him to pay $713,924 in restitution.  Except as to the matter of the investors' loss, the district court adopted the findings in the presentence investigative report.  Hall maintains that: (1) The district court's "loss" finding was neither explained nor supported by sufficient evidence; (2) The district court failed to explain adequately the chosen sentence; (3) The 188-month sentence exceeds the five-year statutory maximum on certain mail and wire fraud counts;

and (4) The district court's application of the abuse of trust enhancement was plain error because Hall took the money as an entrepreneur not as an investment broker. With the exception of Hall's challenge to the abuse of trust enhancement, the government agrees a remand for resentencing is required.

This court reviews sentences for reasonableness using an abuse of discretion standard. *See Gall v. United States*, 552 U.S. 38, 45 (2007). Where a sentence is procedurally unsound, there has been an abuse of discretion. *See United States v. McCants*, 554 F.3d 155, 160 (D.C. Cir. 2009). This court applies a less exacting plain error prejudice requirement in the sentencing context, while still requiring a "reasonable likelihood that the sentencing court's obvious errors affected [the] sentence." *United States v. Saro*, 24 F.3d 283, 287–88 (D.C. Cir. 1994); *see also In re Sealed Case*, 527 F.3d 188, 191–92 (D.C. Cir. 2008).

First, it is unclear how the district court determined the amount the investors lost was more than one million dollars. At sentencing the district court stated it was relying on the method in *United States v. Orton*, 73 F.3d 331, 334 (11th Cir. 1996), and the parties agree that under the "loss to losing victims" method the amount of loss would have been $747,169, the amount the jury ordered to be forfeited; alternatively, the government suggests the district court could have found that the amount of loss was $713,924, the amount identified in the presentence report as the net loss to investors. *See* Appellant's Br. 43; Appellee's Br. 59 n.36. In rejecting both Hall's figure ($713,924) and the government's original figure ($1,394,234), the district court stated that the loss was just over one million dollars. Tr. 12/7/06 at 41. As a result, Hall's sentence was subject to a 16 point enhancement rather than a 14 point enhancement under the U.S. Sentencing Guidelines ("U.S.S.G.") § 2B1.1(b)(1), increasing his sentencing range from 151 to 188

months to 188 to 235 months. Hall points to the government's evidentiary submissions in maintaining there is insufficient evidence for calculating the loss under the *Orton* method at over one million dollars. *See* Appellant's Br. 43–45. Although the district court is required only to "make a reasonable estimate," U.S.S.G. § 2B1.1 cmt. n.3(C), we remand for the court either to explain how it arrived at its estimate or to recalculate the amount of the loss.

Second, the district court did not explain the particular sentence it imposed as 18 U.S.C. § 3553(c) requires. *See In re Sealed Case*, 527 F.3d at 191. At a criminal offense level of 36, Hall's guidelines range was 188 to 235 months, rather than the 151 to 188 months for a criminal offense level of 34. The district court sentenced Hall to 188 months without explaining the choice of that particular term of imprisonment. Tr. 12/7/06 at 41. When the guidelines range is greater than twenty-four months, the district court "shall state in open court the reasons" it is "imposing a sentence at a particular point within the range." 18 U.S.C. § 3553(c)(1). Although the district court explained that Hall would be sentenced "for what he did which was to cheat, lie, and steal to enrich himself and which caused great injury to others," Tr. 12/7/06 at 37, and that no one was to blame for the injury to investors "other than Mr. Robert Hall," *id*. at 39, the district court did not explain why, in view of the factors in 18 U.S.C. § 3553(a), a sentence of 188 months was necessary, much less why the lower sentence that Hall requested would be insufficient. A remand is, therefore, required. *See In re Sealed Case*, 527 F.3d at 191; *see also Rita v. United States*, 551 U.S. 338, 356–58 (2007).

Third, the parties suggest that the district court should impose an appropriate sentence on each count and specify how each is to be served, concurrently or consecutively, instead of imposing a single sentence of 188 months for all of the counts

of conviction.  Tr. 12/7/06 at 41.  The maximum penalties of some counts were less than the term imposed.  Because we must remand the case for resentencing for the district court to explain how it determined the amount of the loss and the resulting offense level under U.S.S.G. § 2B1.1(b)(1), and to specify the reasons for choosing the particular point in the sentencing range pursuant to 18 U.S.C. § 3533(c), on remand the district court also can specify sentences for the individual counts.

However, we find no plain error by the district court in applying a two-level enhancement for abuse of trust under U.S.S.G. § 3B1.3.[7] *See United States v.  Whren*, 111 F.3d 956, 960 (D.C. Cir. 1997); *Saro*, 24 F.3d 283, 287–88.  Application Note 2, relied upon by the district court, stated that the "adjustment also applies in the case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of public or private trust . . . .  For example . . . a defendant who  . . . perpetrates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker."  U.S.S.G.§ 3B1.1 cmt. n.2 (2002) (now

---

[7]  U.S.S.G. § 3B1.3 provides:

If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may 3B1.1 (Aggravating Role).

U.S.S.G. §3B1.1 cmt. n.3 (2009)).[8] The district court found that Hall "had provided sufficient indicia to the victims that he was a legitimate financial advisor when in truth he used that position to defraud investors." Presentence Investigation Report ¶ 61.

Hall contends that the abuse of trust enhancement can apply "[o]nly if the defendant exploited a special position of trust that he either occupied or pretended to occupy," Appellant's Br. 48–49, and that he "never purported to be handling the victims' money as a financial advisor, investment broker, or other investment intermediary, fiduciary, or custodian," *id.* at 49. Rather, he maintains he only was "soliciting their money as an entrepreneur," *id.* at 49. But First United's website boasted of its prowess as "a financial services powerhouse" with "services . . . designed to assist clients for whom professional wealth building consultation was previously unaffordable," focusing on those "historically disenfranchised from the information that safeguards their financial future." Gov't Ex.18. The corporate

---

[8] Application Note 2 provided in full:

This adjustment also applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not. For example, the enhancement applies in the case of a defendant who (A) perpetrates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker; or (B) perpetrates a fraud by representing falsely to a patient or employer that the defendant is a licensed physician. In making the misrepresentation, the defendant assumes a position of trust, relative to the victim, that provides the defendant with the same opportunity to commit a difficult-to-detect crime that the defendant would have had if the position were held legitimately.

U.S.S.G. § 3B1.3 cmt. n.2 (2002).

summary in the prospectus for the Trinidad project stated that First United operated in the areas of "Financial Management, Financial Planning, Venture Capital, [and] Asset Management." Gov't Ex. 24. Investors testified that Hall advised them of the financial advantages of investing in First United and also to reinvest the interest they had earned, while emphasizing the investment discretion that they conferred upon him under the asset placement agreements. Indeed, sentencing counsel acknowledged that application of the enhancement was "arguable," Def.'s Sentencing Memorandum at 10.

The cases on which Hall relies do not involve plain error review. Even so, in *United States v. Mullens,* 65 F.3d 1560, 1566 (11th Cir. 1995), the court concluded the evidence did not show either the kind of "holding out" as an investment broker or the kind of advertising that Hall made about himself and First United as an "asset manager" of investors' funds over which he exercised control. Moreover, other circuits take a broader view of the application of the enhancement than Hall urges, *see United States v. Morris*, 286 F.3d 1291, 1299 n.13 (11th Cir. 2002) (citing cases). Perhaps more helpful to Hall is precedent that the position of trust inquiry "must focus on the relationship between the defendant and the victim from the perspective of the victim," *United States v. Caplinger*, 339 F.3d 226, 236 (4th Cir. 2003), and avoid application of the enhancement in "'arms-length commercial transactions where trust is created by the defendant's personality or the victim's credulity,'" *id.* at 237 (quoting *United States v. Bollin*, 264 F.3d 391, 415 (4th Cir. 2001)). Yet even that court and other circuits uphold application of the enhancement where the defendant has broad discretion to act on behalf of the victim and the victim believes the defendant will act in the victim's best interest, *see Bollin*, 264 F.3d at 415–16, as the government's evidence here showed. *See generally Morris*, 286 F.3d at 1296–97 (noting that in absence of a clear definition of "position of trust" in the Guidelines,

whether to apply the enhancement is "highly dependent on the specific facts in each situation"). To the extent Hall views the enhancement to be limited under Application Note 1 to circumstances involving a narrow definition of "position of trust," Appellant's Br. 48; *see United States v. Tann*, 532 F.3d 868, 875–76 (D.C. Cir. 2008), Application Note 2, by using the word "also", suggests that the district court's reliance on Application Note 2 was not plain error.

Accordingly, we affirm the judgment of conviction but remand for resentencing.